David COLAN, Plaintiff,

v.

CONTINENTAL TELECOM, INC. and Management Assistance, Inc., Defendants.

No. 83 Civ. 7304 (EW).

United States District Court, S.D. of New York.

Sept. 9, 1985.

**1522**

Milberg, Weiss, Bershad, Specthrie, & Lerach, New York City, Seymour A. Oliff, Chicago, Ill., for plaintiff; Lawrence Milberg, Jeremy Heisler, New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for defendant Continental Telecom, Inc.; Raymond L. Falls, Jr., Charles A. Gilman, Devereux Chatillon, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is an action by plaintiff, a shareholder of Management Assistance Inc. ("MAI") to recover on its behalf, pursuant to § 16(b) of the Securities Exchange Act of 1934,[1] short swing profits from defendant Continental Telecom Inc. ("Continental"), allegedly derived from the purchase and sale of MAI stock within a six month period. Prior to the commencement of the action, plaintiff demanded that MAI take steps to recover the claimed profits, but it declined upon the ground that no violation of § 16(b) had occurred with respect to the transactions at issue, and accordingly plaintiff asserts further demand would be futile.

While the parties have submitted massive papers, documents and briefs relative to their respective contentions, the basic issue is whether a written option agreement executed on May 24, 1982, is what it purports to be, an option to MAI to purchase the shares owned by Continental or, as plaintiff contends, a guise or a sham to cover up the true nature of the transaction—an effective transfer equivalent to a sale by Continental of its shares to MAI, which, if such were the fact, was subject to the provisions of § 16(b).

In response to Continental's motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss plaintiff's first amended complaint, he cross moved for summary judgment.[2] Upon the argument of the motions, it appeared there was so little substance to the plaintiff's motion that it was denied, but the Court reserved decision on Continental's motion, which we now address.

Except for plaintiff's claim that the May 24, 1982 agreement was a sham, the basic

---

1. 15 U.S.C. § 78p(b) (1982) provides in pertinent part that: "For the purpose of preventing the unfair use of information which may have been obtained by [any] beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request."

2. Both parties submitted affidavits and exhibits in support of and opposition to their respective motions and clearly considered them to be motions for summary judgment as authorized under Fed.R.Civ.P. 12(b)(6).

facts are not in dispute. MAI has been engaged since 1961 in the business of selling and servicing information processing systems, and since 1971 engaged in the development and manufacture of its own proprietary computers and computer software, for, inter alia, business applications. Its products are marketed in the United States and more than thirty-five other countries and in the fiscal year preceding matters here at issue its revenue was $332,000,000.

Continental is a holding company with substantial interests in the telecommunications field. In recent years Continental has acquired control of several other companies with a view to diversifying its offerings of telecommunications goods and services, including an initial entry into the highly competitive field of data processing and data communications. In pursuit of this program of expansion, Continental, over a period of time, "in steps" purchased in the open market shares of MAI common stock, the last purchase occurring toward the end of April 1982, by which date it was the owner of approximately fifteen percent of all outstanding common stock of MAI and thus a statutory insider of MAI under § 16(a) of the Securities Exchange Act of 1934.[3] With respect to these various purchases Continental filed with the Securities and Exchange Commission a Schedule 13–D statement that the shares were acquired for investment purposes. An amendment filed in April 1982 stated that it planned to acquire up to 25% of the outstanding shares of MAI common stock.

Not surprisingly, the situation was a matter of concern to MAI, its directors, officers and employees. While Continental stated its acquisitions were for investment purposes, MAI viewed them as an aggressive accumulation of shares "with the apparent intent to take control of MAI."[4] MAI's Board of Directors considered that

acquisition of control by Continental was contrary to the best interests of MAI, its stockholders, its executives and employees, and based upon an investigation of Continental and activities, advised Continental on May 4, 1982 that it was prepared "to do whatever is necessary and in whatever forum is appropriate, the Courts, the financial community, the press and the various regulatory authorities" to prevent a takeover and control of MAI by Continental.

MAI's view that a takeover and control by Continental would be detrimental to MAI's welfare and interests was based essentially on concerns about Continental's lack of experience in the development of computer software and hardware for domestic and foreign markets; an adverse effect upon the morale of its existing staff of employees and officers; diminution of ability to attract new employees to MAI; foreclosure of new business ventures and financing arrangements; discouragement of beneficial investment in MAI by other companies which had manifested such an interest; as well as other adverse consequences that would follow in the wake of a takeover. Continental on its part sought to assure MAI directors that its purpose was well-intentioned and beneficially oriented— that is actions would result in substantial benefits to MAI shareholders and management, that it had never in more than 700 takeovers over a twenty year period fired any one as a result of an acquisition.

Between June 1981 and May 1982 officials of the two companies sought without success to explore possibilities for mutually beneficial relationships between the two companies. Beginning on or about May 4, 1982, the then strongly held and conflicting views of the parties were aired publicly by press releases and by an exchange of letters to directors and officials of each company in which criminatory and recriminatory charges were made. The dispute at-

---

3. 15 U.S.C. § 78p(a) (1982).

4. Letter from Raymond Kurshan to Charles Wohlstetter, May 4, 1982, Exhibit B to Affidavit of Charles Wohlstetter.

tracted the attention of the investment industry and financial news media. Notwithstanding their differences and hostile attitudes, officials of both companies still sought to reach an accommodation to resolve the matter. Continental rejected a proposal for a "standstill agreement" whereby it would be prevented from making purchases beyond twenty percent of MAI's outstanding stock over an eight year period. Similarly, during this period of charged controversy, a proposal whereby MAI offered to buy back all MAI shares owned by Continental was refused. Faced with the prospect of costly litigation and its uncertain outcome, the parties negotiated a settlement which resulted in the May 24, 1982 option agreement here at issue. It was the result of arms length negotiations carried on by the principal executives of the parties and their respective attorneys.[5]

At the time of the execution of the agreement, Continental owned approximately 15.43% of the total issued and outstanding of MAI stock. MAI, in substance, among other matters, was given the right up to November 30, 1982 to purchase all the 1,288,300 shares of MAI common stock owned by Continental. The price paid for the option was $2,500,000 ($1.94 per share). This sum was not to be refunded in the event MAI did not exercise the option. The exercise price of the option was $21,880,000 ($16.98 per share).[6] Continental agreed not to purchase any more MAI securities, solicit proxies or take any action to acquire control of MAI; to vote its shares in favor of MAI's Board's nominees and to vote upon any other matter in the same proportion as other holders of MAI stock; no proxy was given. Also, Continental agreed

that if MAI exercised its option, it would not purchase MAI stock for three years from the closing date. On the last day of its right to exercise the option, November 30, 1982, MAI, pursuant to a provision in the option agreement, exercised its right upon a payment of $583,000, to extend the option period to April 30, 1983. This amount was not to be credited against the price of the stock in the event MAI exercised the option. Following the extension, MAI sought substantial revisions of the option agreement, including a two year extension of its obligation to pay in the event it exercised the option, as well as certain waivers which would give MAI additional time to decide whether or not to exercise its option. Continental refused these proposals and insisted upon adherence to the terms of the option agreement. Finally, on the very last day that the option could be exercised as extended, March 28, 1983, MAI gave notice that it exercised its option and purchased from Continental all its shares of common stock. The acquisition of the shares was well beyond the six month period of the last purchase of MAI stock by Continental in April 1982.[7]

Initially, after MAI declined plaintiff's request that it take action against Continental to recover the profits realized by it on the transaction, plaintiff instituted an action in the Supreme Court of the State of New York (which was consolidated with other actions) against MAI's directors, wherein derivative and class action claims were asserted. Essentially, the companies charged the directors with breach of fiduciary duty upon allegations that they had acted out of self-interest to perpetuate their control over the corporations; had

---

5. See Affidavit of Charles Wohlstetter at 4; Affidavit of Robert W. Berend at 18–19 & n. 15.

6. The exercise price to be paid was $18.25 per share x 1,288,300 shares = $23,511,475, less $2,500,000, the price paid for the option, plus interest at 8% per annum on the exercise price for the approximately six months between the date of agreement in principle and the exercise date.

7. Prior to the execution of the May 24 option agreement, there were preliminary discussions of the possibility of a straight purchase by MAI of the shares held by Continental, but no agreement was reached as to any purchase or sale, immediate or deferred.

agreed to an excessive price for the purchase of the shares; had wasted corporate assets; and further alleged that MAI should have offered the same purchase terms to all of its stockholders that it had offered to Continental. The directors defended their action upon the ground that the option agreement was necessary to protect MAI's interest and that the acquisition of the Continental shares served a valid business purpose. The New York State Supreme Court Justice dismissed the actions under New York's business judgment rule, holding that plaintiffs had failed to make any showing that the director-defendants had made any profit at the expense of MAI. The court specifically noted that a purchase of stock can legitimately be made to remove the threat of a corporate raider whose goals would be detrimental to those of the corporation.[8]

Plaintiff then repaired to this Court with the allegations already noted, upon which it seeks recovery from Continental.

This Court, of course, is aware of the stringency with which Rule 56 has been enforced by our Court of Appeals.[9] However, the Rule should be enforced where justified, otherwise it is a dead letter. Litigants should not have to suffer the burden of extensive and ofttimes excessive and abusive pretrial discovery, vast legal fees, and the distraction of corporate officers from their assigned duties unless genuine issues of fact exist that preclude enforcement of the Rule.[10] This Court is persuaded upon a close and intensive study of this record that other than the argumentative and conclusory matters urged by plaintiff, no genuine issue of fact exists and the defendant is entitled to summary judgment. A party cannot defeat a motion for summary judgment on conjectural allegations, but must set forth facts indicating that there is a genuine issue for trial—this the plaintiff has failed to do.[11]

It cannot be disputed that the May 24, 1982 option agreement was entered into in a hostile atmosphere and essentially was based upon MAI's concern that its interests as a corporation and those of its shareholders would be adversely affected by Continental's takeover; that Continental's large holdings of MAI stock offered no benefits to MAI because Continental did not offer MAI any products, services, technology or managerial or financing ability needed by MAI or unobtainable elsewhere. So, too, it admits of no challenge that the negotiations were at arms length, with the parties represented by counsel; MAI had, in addition, the independent financial advice of two reputable investment banking firms that the option price was fair, along with the advice of outside legal counsel as to the legal aspects of the proposed transaction. Likewise, it is beyond dispute that the MAI directors acted in the firm belief that the option agreement was necessary to protect MAI and its shareholders against what was deemed predatory conduct by a corporate raider.

---

8. *Lewis et al. v. Kurshan et al.,* New York Law Journal, December 1, 1983.

9. *See e.g., Gary Plastic Packaging Corp. v. Merrill, Lynch,* 756 F.2d 230 (2d Cir.1985); *Heyman v. Commerce & Industry Ins. Co.,* 524 F.2d 1317 (2d Cir.1975); *Miller v. General Outdoor Advertising,* 337 F.2d 944 (2d Cir.1964).

10. The burdens of excessive discovery can be particularly acute in the context of actions to enforce federal securities laws; indeed, the Supreme Court has expressed sharp concern over the "possible abuse of the liberal discovery provisions of the Federal Rules of Civil Procedure" in "nuisance or 'strike' suits" under the securities statutes. *Blue Chip Stamps v. Manor Drug*

*Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

11. *Cf. Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970); *see also Samuels v. Eleanor Beeher, B.V.,* 500 F.Supp. 1357, 1364–65 (S.D.N.Y. 1980), *aff'd,* 661 F.2d 907 (2d Cir.1981); *Steinberg v. Carey,* 439 F.Supp. 1233, 1241 (S.D.N.Y. 1977); *Miller v. Schweickart,* 413 F.Supp. 1062, 1069 (S.D.N.Y.1976); *Schwartz v. BMI,* 180 F.Supp. 322, 325 (S.D.N.Y.1959); *Morgan v. Sylvester,* 125 F.Supp. 380, 389 (S.D.N.Y.1954), *aff'd,* 220 F.2d 758 (2d Cir.), *cert. denied,* 350 U.S. 867, 76 S.Ct. 112, 100 L.Ed. 768 (1955).

Notwithstanding, plaintiff claims the option was a facade to cover up a sale that took place on or prior to May 24. Plaintiff to support his contention relies upon the acknowledgment by the principal negotiators of each company, Continental's Chairman of the Board, and MAI's general counsel and a director, to the effect that prior to the execution of the agreement there had been discussions of a straight purchase of the shares. Continental's chairman swears, however, that Continental did not agree to any purchase or sale transaction, either immediate or deferred. MAI's counsel, in an affidavit submitted in the State Supreme Court action in support of its motion to dismiss the action, acknowledged that on May 21, 1982 the parties reached an agreement in principle for the sale of the stock, which was followed by the execution of the agreement of May 24, 1982; accordingly, plaintiff contends that the parties had actually entered into an agreement for the sale of the shares on May 21 and that the written document was a sham to cover up the actual sale. This ipse dixit claim is a quantum leap that disregards the factual attendant circumstances that led to the execution of the agreement. Plaintiff's conceptual theorizing seeks to displace the reality of events. Continental's Chairman testified in his affidavit that Continental, advised of the provisions of § 16(b), refused to enter into any agreement for the sale of its MAI shares. Not a single evi-

dentiary fact has been offered by plaintiff to support his claim. Continental was within its legal right to structure the transaction so as to avoid liability under § 16(b) and there is nothing improper in so structuring a transaction.[12]

■ The history and the purpose of § 16(b) have been set forth at length in numerous rulings which need not be detailed here.[13] It is a rigid rule of strict liability requiring the disgorging of profits derived by the unfair use of inside information. Its essential purpose is to discourage and curb speculative activities by fiduciaries and those with access to inside information. The statute is to be applied when it serves to implement its intended purpose.[14] However, it is not to be applied woodenly or mechanistically to impede bona fide transactions which do not implicate the speculative abuses the statute was designed to prevent.[15]

■ Thus, the basic issue is whether the transaction here at issue could lend itself to the abuse Congress sought to prevent—the realization of short swing profits based upon access to inside information,[16] or, as the Supreme Court has phrased it, "whether the method used to 'avoid' liability is one permitted by the statute."[17]

In the instant case there is no claim, nor upon the record can any claim validly be made that Continental, despite its owner-

12. *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972).

13. *See Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 601, 93 S.Ct. 1736, 1748, 36 L.Ed.2d 503 (1973); *Blau v. Lamb*, 363 F.2d 507 (2d Cir.1966), *cert. denied*, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967); *Blau v. Max Factor & Co.*, 342 F.2d 304 (9th Cir.), *cert. denied*, 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965); *Adler v. Klawans*, 267 F.2d 840 (2d Cir.1959); *Smolowe v. Delendo Corp.*, 136 F.2d 231 (2d Cir.), *cert. denied*, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943).

14. *See Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 424, 92 S.Ct. 596, 600, 30 L.Ed.2d 575 (1972).

15. *See Abrams v. Occidental Petroleum Corp.*, 450 F.2d 157, 159, 162 (2d Cir.1971) (citing *Roberts v. Eaton*, 212 F.2d 82 (2d Cir.), *cert. denied*, 348 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652 (1954), *aff'd*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).

16. *Kern County Land Co. v. Occidental Corp.*, 411 U.S. 582, 584, 594, 93 S.Ct. 1736, 1739, 1744, 36 L.Ed.2d 503 (1973), *aff'g Abrams v. Occidental Petroleum Corp.*, 450 F.2d 157 (2d Cir.1971).

17. *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972).

ship of fifteen percent of MAI shares had access to inside information which it used or sought to use to make a profit within the proscribed statutory period. Its undisputed purpose was to gain control of MAI, which led to resistance by MAI officials because in their view, such control, if acquired, would have been detrimental to MAI's other stockholders, its management and personnel. MAI, upon advice of specially retained investment experts and legal counsel, decided their interests could best be protected by an option, which if exercised was intended to assure that a hostile force had been removed. Even though there had been discussions during the negotiations of an outright sale of the shares, Continental had the legal right to structure the transaction with the intent to avoid liability under § 16(b). The established rule is that the "mere grant of an option to purchase is not a sale for the purposes of § 16(b); this occurs only when the optionee exercises the option." [18]

The record is barren of any factual matter to support a finding that either before or after the option was granted that Continental, despite its ownership of more than ten percent of the outstanding shares, enjoyed an insider's opportunity to acquire information about MAI's affairs. The record, as noted, emphatically points in the opposite direction, with MAI's determined resistance to Continental's alleged purpose to acquire control; its aggressive campaign to thwart Continental, which included a threat to expose alleged shortcomings of Continental in the conduct of its own business affairs. In light of these concerns, which foreclosed Continental from access to confidential and inside information, the negotiation and execution of the option agreement does not "smack of insider trading." [19]

Neither is there any basis to support plaintiff's conclusory allegation that the sale took place in advance of the exercise of the option on the last day it could be exercised. The price paid for the option was based upon the professional judgment of two recognized investment firms who reached independent judgment that it was fair and reasonable. It was not so large in relation to the purchase price that its exercise was practically compelled, even considering MAI's avowed purpose to rid itself of a potentially troublesome stockholder.[20] Indeed, that MAI would exercise its option was far from a certainty. It not only took advantage of an extension provided for by the agreement, but sought, without success, to obtain an extension of payment in the event it did decide to exercise the option. MAI at all times was free to decide for itself whether or not to exercise the option and Continental had no control over MAI's decision. Continental had no representative on MAI's Board of Directors or was any of its officials involved in the executive management of MAI.

Plaintiff's claim that the option was a sham, in effect a fraud "accompanied by a wink of the eye" [21] does not wash. Here he relies upon the provision in the option agreement whereby Continental agreed not to purchase any more MAI securities, solicit proxies or to take any action to control MAI and to vote its shares in favor of MAI's Board of Nominees, and in the event MAI exercised its option Continental would not purchase MAI stock for three years from the closing date. By no means did these provisions give Continental insider information to permit speculative abuse by Continental within a six months period. This was the part of the protection that MAI paid for in resisting Continental's at-

---

**18.** *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 601, 93 S.Ct. 1736, 1748, 36 L.Ed.2d 503 (1973), *aff'g Abrams v. Occidental Petroleum Corp.,* 450 F.2d 157, 159, 164 (2d Cir.1971); *Silverman v. Landa,* 306 F.2d 422 (2d Cir.1962).

**19.** *Kern County,* 411 U.S. at 601, 93 S.Ct. at 1748.

**20.** *Id.* at 603, 93 S.Ct. at 1749.

**21.** *Abrams v. Occidental Petroleum Corp.,* 450 F.2d 157, 165 (2d Cir.1971), *aff'd,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).

tempted takeover; it bought its peace for a period so that it could carry on, without disruption, its normal corporate functions. To adopt plaintiff's theory would require, if the impact of Rule 16(a) is to be avoided, that the parties continue their internecine activities with its destructive potentialities upon the welfare of MAI for a period of six months from the time of the last purchase of shares by Continental. Taking full account of the prophylactic purposes of Rule 16(a), it does not require such irrational conduct.

The factual situation here is markedly different from *Bershad v. McDonough*,[22] upon which plaintiff relies. There the optioner, who had a double insider status as a director and holder of more than ten percent of the stock, not only gave the optionee an irrevocable proxy to vote the shares for the life of the agreement, the optioner and one of his associate directors immediately resigned as directors of the optionee and were replaced by officers of the optionee, and the stock which was the subject of the transaction was placed in escrow, all of which was found to justify that it was a "wink of the eye" transaction. Indeed, Mr. Justice Stewart, in distinguishing the *Bershad* case from the *Occidental Petroleum* case, observed that there "the optioner did not surrender practically all emoluments of ownership by executing the option. Nor did any other special circumstances indicate that the parties understood and intended that the option was in fact a sale."[23]

In sum, the Court concludes that the option agreement was valid, is what it purports to be and was not a sham to cover up a sale of the consolidated shares and thus was not subject to the provisions of section 16(b).

The defendants' motion for summary judgment is granted. Judgment may be entered accordingly.

---

**22.** 428 F.2d 693 (7th Cir.1970), *cert. denied,* 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971).

---

**23.** *Kern County,* 411 U.S. at 604, 93 S.Ct. at 1749.