Margaret GWOZDZINSKY, Derivatively on Behalf of REVCO D.S., INC., Plaintiff,

v.

ZELL/CHILMARK FUND, L.P. and Revco D.S., Inc., Defendants.

No. 95 CIV. 10563(JES).

United States District Court, S.D. New York.

Oct. 17, 1997.

Ostrager, Chong & Flaherty, P.C., New York, NY (Glenn F. Ostrager, of counsel), Bragar & Wexler, P.C., New York, NY (Paul D. Wexler, of counsel), for Plaintiff.

Seyfarth, Shaw, Fairweather & Geraldson, New York, NY (John C. Sabetta, of counsel), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL (Alan L. Unikel, James M. Wyman, of counsel), for Defendant.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff Margaret Gwozdzinsky ("Gwozdzinsky") brings this derivative action against defendant Zell/Chilmark Fund L.P. ("Zell/Chilmark"), alleging that Zell/Chilmark, as an "insider" of Revco D.S., Inc. ("Revco"), violated Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act") by writing short put options or call equivalent positions under two standby purchase agreements, thereby resulting in short-swing profits in the form of standby purchase fees.

Pursuant to Federal Rule of Civil Procedure 56, Zell/Chilmark moves for summary judgment on the grounds that Gwozdzinsky has failed to state a cause of action under Section 16(b) of the Exchange Act and that her claim with respect to the first standby purchase agreement is time-barred by the applicable statute of limitations. Gwozdzinsky cross-moves for summary judgment. For the reasons set forth below, Zell/Chilmark's motion for summary judgment is granted and Gwozdzinsky's cross-motion for summary judgment is denied.

## BACKGROUND

Revco, one of the largest drug retail chains in the United States, is a Delaware corporation with its principal place of business in Ohio. *See* Complaint ¶ 2; Defendant's Southern District of New York Civil Rule 3(g) Statement of Undisputed Facts ("Def.'s 3G Statement") ¶ 1. Revco stock trades on the New York Stock Exchange. *See* Defendant's Memorandum in Support of Motion for Summary Judgment ("Def.'s Memo") at 2. Gwozdzinsky is a Pennsylvania resident who owns Revco stock. *See* Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment and in Support of Cross-Motion for Summary Judgment ("Pl.'s Memo") at 4. Zell/Chilmark is an investment fund that owns roughly twenty percent of Revco's outstanding common stock and is

controlled by Samuel Zell ("Zell") and David Schulte ("Schulte"). *Id.* at 3. At all relevant times, both Zell and Schulte were members of Revco's Board of Directors and Zell was Co-Chairman of Revco's Executive Committee. *Id.* at 3–4.

On June 1, 1992, Revco emerged from bankruptcy under a plan of reorganization (the "Plan"). *See* Def.'s 3G Statement ¶ 5. Part of the Plan required Revco to issue an aggregate of $433.2 million in debt securities with interest rates of eleven percent or higher. *Id.* ¶ 6. Revco adopted a recapitalization plan which included raising $110 million in equity through the sale of 13,750,686 shares of common stock in a pro rata rights offering to shareholders of record on December 28, 1992 (the "1992 Rights Offering").[1] *Id.* ¶¶ 8, 10, 12. Under the 1992 Rights Offering, a shareholder would receive 0.384 rights for each share of common stock owned. *Id.* ¶ 12. One full right entitled a shareholder to buy one share of the available 13,750,686 shares of common stock for $8.00 per share, thus raising a total of $110,005,488 in equity. *Id.* In addition, an oversubscription privilege was available to each shareholder who exercised all of his accumulated rights. *Id.* ¶ 13. This privilege enabled the shareholder to purchase at $8.00 per share any shares remaining unissued, up to the number of shares that the shareholder initially purchased under his accumulated rights. *Id.*

On December 15, 1992, to ensure that this $110 million in equity would be raised, Revco entered into a Standby Purchase Agreement (the "1992 Standby Purchase Agreement") with Zell/Chilmark and Magten Asset Management, Inc. ("Magten").[2] *See* Def.'s 3G Statement ¶ 11. The latter parties agreed that they would (a) exercise all of the rights distributed to them under the 1992 Rights Offering and (b) purchase, at $8.00 per share, any shares that remained unsold, up to an aggregate cost of $150 million. *Id.* ¶ 14. As compensation for assuming this obligation, Zell/Chilmark and Magten received a stand-

---

1. Revco specified the offering terms in a prospectus dated December 17, 1992. *See* Def.'s 3G Statement ¶¶ 10, 12.

2. Magten is not a party in the instant action. *See* Pl.'s Memo. at 4 n. 1.

by purchase fee of $1,452,448, of which Zell/Chilmark received $841,265. *Id.* ¶ 15.

In January 1993, Zell/Chilmark exercised its rights as a Revco shareholder under the 1992 Rights Offering. *See* Def.'s 3G Statement ¶ 17. Zell/Chilmark purchased 2,706,-558 shares of common stock pursuant to its accumulated rights, and 134,982 shares pursuant to the oversubscription privilege. *Id.* That same month, Zell/Chilmark purchased an additional 517 shares of Revco common stock pursuant to its obligations under the 1992 Standby Purchase Agreement. *Id.* ¶ 18. In accordance with Section 16(a) of the Exchange Act, *see* 15 U.S.C. § 78p(a) (1995), Zell/Chilmark disclosed these purchases to the Securities Exchange Commission ("SEC") in its 1993 Form 4 filing. *See id.* ¶ 19.

In September 1993, after other Revco shareholders had failed "to complete the exercise of their rights" under the 1992 Rights Offering, *see* Def.'s 3G Statement ¶ 20, Exh. 7 at 3, Zell/Chilmark purchased an additional 17,153 shares of Revco common stock pursuant to the oversubscription privilege, and an additional 12,912 shares pursuant to its obligations under the 1992 Standby Purchase Agreement. *Id.* ¶ 20. Zell/Chilmark also disclosed these purchases to the SEC in its 1993 Form 4 filing. *Id.* ¶ 21.

In 1994, Revco effected a second pro rata rights offering (the "1994 Rights Offering") in order to finance its proposed acquisition of another retail drug chain. *See* Def.'s 3G Statement ¶ 24. While the structure of the 1994 Rights Offering was similar to the one in 1992, Revco's common stock had appreciated considerably since 1992.[3] *Id.* ¶¶ 25–26. For each share of common stock owned, a shareholder would receive 0.305 rights. *Id.* ¶ 27. Each full right entitled a shareholder to buy one share of the 15,500,000 shares of common stock offered pursuant to the 1994 Rights Offering at a price of $14.00 per share, for a total of $217 million in equity. *Id.* ¶¶ 25, 27. As with the 1992 Rights Offering, an oversubscription privilege was available to each shareholder who had exercised

all rights available under the 1994 Rights Offering. *Id.* ¶ 28.

On June 8, 1994, Revco entered into a Standby Purchase Agreement with Zell/Chilmark to ensure that this equity would be raised (the "1994 Standby Purchase Agreement"). *See* Def.'s 3G Statement ¶¶ 29, 32. Zell/Chilmark agreed that it would (a) exercise all of the rights distributed to it under the 1994 Rights Offering, including those offered under the oversubscription privilege, and (b) purchase any shares that remained unsold. *Id.* ¶ 30. As compensation for assuming this obligation, Zell/Chilmark received a standby purchase fee of $2,839,058 pursuant to the terms of the 1994 Standby Purchase Agreement. *Id.* ¶ 31.

On July 7, 1994, Zell/Chilmark exercised its rights under the 1994 Rights Offering and purchased 3,025,738 shares of Revco common stock under its accumulated rights and 153,-511 shares pursuant to its oversubscription privilege at a price of $14.00 per share. *See* Def.'s 3G Statement ¶ 34. In addition, Zell/Chilmark purchased 2,589 shares in accordance with its obligations under the 1994 Standby Purchase Agreement. *Id.* ¶ 35. Zell/Chilmark disclosed these purchases to the SEC in a Form 4 filing on July 27, 1994, and in an amendment to that filing on January 9, 1995. *Id.* ¶ 37. To date, Zell/Chilmark has not sold any of the stock that it purchased pursuant to its obligations under the 1992 and 1994 Standby Purchase Agreements. *Id.* ¶¶ 23, 38; *see also* Def.'s Memo at 14–15.

Gwozdzinsky brings this derivative action, asserting, *inter alia*, that Zell/Chilmark, as an "insider" of Revco, violated Section 16(b) of the Exchange Act and realized short-swing profits when it entered into the 1992 and 1994 Standby Purchase Agreements and received standby purchase fees. *See* Pl.'s Memo. at 2. Gwozdzinsky alleges that Zell/Chilmark's purchase obligations under the standby purchase agreements were derivative securities, specifically "call equiva-

---

3. Revco specified the terms of the 1994 Rights offering in a prospectus dated June 9, 1994. *See* Def.'s 3G Statement ¶ 24.

lent position[s] [4]," that fall within the scope of Section 16(b). *See* Complaint ¶¶ 11, 19. Pursuant to Rule 16b–6(d),[5] *see* 17 C.F.R. § 240.16b–6(d), Gwozdzinsky therefore seeks the return of the 1992 and 1994 standby purchase fees to Revco. *Id.* ¶¶ 11, 19.

In the alternative, Gwozdzinsky argues that the transactions at issue here had the potential for speculative abuse and thus are within the scope of those evils which Congress sought to prevent through Section 16(b). *See* Pl.'s Memo at 20–22. Gwozdzinsky contends that since both the 1992 and 1994 Rights Offerings were planned and administered while Zell and Schulte, Zell/Chilmark's controlling partners, were members of Revco's Board of Directors (the "Board"), while Zell was Co–Chairman of the Board's Executive Committee, and while Zell/Chilmark owned approximately 20% of Revco's common stock, these insiders were able to manipulate the terms of the 1992 and 1994 Rights Offerings using inside information for their own benefit at the expense of the public. *Id.* at 21.

Pursuant to Federal Rule of Civil Procedure 56(b), Zell/Chilmark moves for summary judgment on four grounds: first, that the challenged transactions were proper business transactions which neither established "options" nor violated Section 16(b), *see* Def.'s Memo at 9, 11–12; second, that even if these transactions can be considered "options," there could be no "short-swing" profits because Zell/Chilmark engaged in purchases only, and not sales, *id.* at 9, 14–16; third, that these options did not expire but were in fact exercised by Revco and performed when Zell/Chilmark purchased shares pursuant to the standby purchase agreements, *id.* at 9, 14–16; and, fourth, that Gwozdzinsky's claim with respect to the 1992

Rights Offering is time-barred by the two-year statute of limitations governing actions under Section 16(b). *Id.* at 16.

Pursuant to Federal Rule of Civil Procedure 56(a), Gwozdzinsky cross-moves for summary judgment, claiming that Section 16(b) applies to Zell/Chilmark's transactions, *see* Pl.'s Memo at 2, 25, and that her claim with respect to the 1992 Rights Offering is not time-barred because Zell/Chilmark's improper Form 4 disclosure tolled the statute of limitations. *Id.* at 23.

## DISCUSSION

Section 16(b) of the Exchange Act prohibits insiders [6] from using non-public information for their own benefit in the trade of an issuer's securities and entitles an issuer to recover from an insider any "short-swing profits" derived from a purchase *and* sale, or sale *and* purchase, of that issuer's securities executed within a period of less than six months. *See* 15 U.S.C. § 78p (1995) (emphasis added). Although the SEC has determined that derivative securities, such as short put options and call equivalent positions, are "securities" within the scope of the securities laws, *see* 17 C.F.R. § 240.16a–1 (1997), Gwozdzinsky's claims that Zell/Chilmark's conduct violated Section 16(b) of the Exchange Act must be rejected for several reasons.

First, the Court finds that the standby purchase agreements did not establish options because the exact number of shares that Zell/Chilmark was obligated to purchase was unknown at the time those agreements were executed.. For an instrument to be considered an "option," its *quantity* and price must have been determined at the time of the transaction.[7] Although both

---

**4.** Call equivalent positions are "derivative security position[s] that increase[] in value as the value of the underlying equity increases...." 17 C.F.R. § 240.16a–1(b) (1997).

**5.** Rule 16b–6(d) provides, in relevant part:

Upon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under Section 16(b) of the Act. The profit shall not exceed the premium received for writing the option.

17 C.F.R. § 240.16b–6(d).

**6.** Corporate "insiders" are persons who own more than ten percent of an issuer's equity security, or who are the issuer's directors or officers. *See* 15 U.S.C. § 78p (1995).

**7.** In fact, Gwozdzinsky herself states in her papers that a short put option by definition requires a specific number of shares. *See* Pl.'s Memo at 5, unnumbered note ("A 'short put option' is a contract that entitles the buyer of the put to sell *a*

the 1992 and 1994 Standby Purchase Agreements specified the price of the stock, the exact amount of stock that Revco could put to Zell/Chilmark and which Zell/Chilmark would be obligated to purchase was not ascertainable as of the dates of the standby purchase agreements because no one could have predicted how many shareholders would exercise their accumulated and oversubscription rights pursuant to the rights offerings. Indeed, the number of shareholders who would or would not exercise their rights was dependent upon a wide range of factors including, but not limited to, market price and the individual financial need and resources of each shareholder. Nor did Zell/Chilmark have any "option" to purchase any shares, as that term is commonly understood, because it was legally obliged to do so and thus had no choice not to buy the shares put to it.

Moreover, the transactions at issue here could not have established options because, in a true put option, Revco would be able to force Zell/Chilmark to purchase while having no corresponding obligation to sell. *See Calvine Mills, Inc. v. L.'A. Slesinger, Inc.*, 258 F.2d 228, 230 (2d Cir.1958); 1 WILLISTON ON CONTRACTS § 5:15, 16 (4th ed.1990). Here, by the very terms of the 1992[8] and 1994[9] Standby Purchase Agreements, Revco committed itself to sell and Zell/Chilmark committed itself to buy any shares that remained unsold from the rights offerings. Since both sides were bound to perform, these transactions are inconsistent with the nature of an option which, imposes no obligation on the optionee. *See Calvine Mills*, 258 F.2d at 230.

■ Furthermore, even if the Court accepts Gwozdzinsky's argument that the transactions at issue constituted options, it is clear from the undisputed facts that these options did not expire but were, in fact, exercised by Revco when it caused Zell/Chilmark to purchase stock pursuant to the standby purchase agreements. *See* 17 C.F.R. § 240.16b–6 (1997). Moreover, Zell/Chilmark has not sold any of the shares it acquired pursuant to the standby purchase agreements. *See* Def.'s Memo at 14–15. Section 16(b) imposes liability on insiders only if options *expire, see* 17 C.F.R. § 240.16b–6 (1997), and if purchases and sales are executed within the six month period following the purchase. Because there were no corresponding sales within the six month period following Zell/Chilmark's purchase of stock under the standby purchase agreements, there can be no short-swing profits resulting in Section 16(b) liability.

■ Finally, Gwozdzinsky's policy argument that Zell/Chilmark's transactions car-

---

*specified number of shares* of a particular security to the writer of the put....") (emphasis added). *See* Joel Seligman, *The Structure of the Options Market,* 10 J. Corp. L. 141, 144 (Fall 1984) ("Two basic types of stock options are sold. Call options, or options to buy, give the purchaser the right, but not the obligation, to buy a specific number of shares in a stock at a particular price. Put options, or options to sell, give the purchaser the right, but not the obligation, to sell a specific number of shares in a stock at a particular price....[T]he option writer must buy stock if and when a put option is exercised."); *Certilman Balin Adler & Hyman,* SEC No–Action Letter, [1991–1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 76,144 (Apr. 20, 1992) (the SEC "is of the view that the Instruments are not derivative securities under Rule 16a–1(c) until and to the extent that the number of shares for which they are exercisable is determined...."). Although an SEC No–Action Letter is not entitled to judicial deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Court is persuaded by the SEC's interpretation of the Exchange Act set forth above.

**8.** Section 2.1 of the 1992 Standby Purchase Agreement provides, in relevant part:

Upon the terms and subject to the conditions of this Agreement, Revco agrees to sell to Purchasers [Zell/Chilmark and Magten], and Purchasers agree to purchase from Revco ... at a purchase price per share equal to the Subscription Price, the percentage of Remaining Shares.... Notwithstanding anything herein to the contrary, the [Zell/Chilmark] Fund shall in all events purchase all Remaining Shares not otherwise purchased by Magten.
Def.'s 3G Statement, Exh. 3 ¶ 2.1.

**9.** Section 2.1 of the 1994 Standby Purchase Agreement provides, in relevant part:

Upon the terms and subject to the conditions of this Agreement, Revco agrees to sell to Purchaser [Zell/Chilmark], and Purchaser agrees to purchase from Revco, at a purchase price per share equal to the Subscription Price, the Remaining Shares.
Def.'s 3G Statement, Exh. 10 ¶ 2.1.

ried the potential for speculative abuse is also without merit. Section 16(b) should be enforced "only when its application would serve its goals." *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 595, 93 S.Ct. 1736, 1745, 36 L.Ed.2d 503 (1973); *accord Colan v. Continental Telecom, Inc.* 616 F.Supp. 1521, 1526 (S.D.N.Y.1985), *aff'd*, 788 F.2d 2 (2d Cir.1986). Although district courts have discretion to inquire whether "borderline transactions" create the evil that Congress sought to prevent, *see Kern County*, 411 U.S. at 594, 93 S.Ct. at 1744, Zell/Chilmark's transactions did not carry the potential for speculative abuse. Gwozdzinsky has failed to specify the inside information that Zell/Chilmark allegedly used to its own advantage. *See* Pl.'s Memo at 10; *see also Newmark v. RKO General, Inc.*, 425 F.2d 348, 355 (2d Cir.1970); *Colan*, 616 F.Supp. at 1526–27. Moreover, Zell/Chilmark's transactions were beneficial, and perhaps essential, to Revco's financial survival, and were sanctioned by two large, well-established investment firms. *See* Def.'s 3G Statement, Exhs. 4, 11; *see also Colan*, 616 F.Supp. at 1526–27. Thus, Gwozdzinsky's arguments that Zell/Chilmark's transactions violated Section 16(b) of the Exchange Act must be rejected.[10]

## CONCLUSION

For the reasons set forth above, Zell/Chilmark's motion for summary judgment is granted and Gwozdzinsky's cross-motion for summary judgment is denied. The Clerk of Court shall enter judgment accordingly.

It is **SO ORDERED.**

10. In light of the Court's decision on the merits of Gwozdzinsky's claims, the Court need not address the statute of limitations issue raised by Zell/Chilmark.