Margaret GWOZDZINSKY, Derivatively on behalf of Revco D.S., Inc., Plaintiff–Appellant,

v.

ZELL/CHILMARK FUND, L.P. and Revco D.S., Inc., Defendants–Appellees.

Docket No. 97–9406.

United States Court of Appeals, Second Circuit.

Argued June 12, 1998.

Decided Sept. 2, 1998.

Glenn F. Ostrager, Ostrager, Chong & Flaherty, P.C., New York City (Bragar & Wexler, P.C., New York City, on the brief), for Plaintiff–Appellant.

Alan L. Unikel, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL (James M. Wyman, Chicago, IL, & John C. Sabetta, New York City, on the brief), for Defendant–Appellee Zell/Chilmark Fund, L.P.

Before: WALKER, McLAUGHLIN, and PARKER, Circuit Judges.

JOHN M. WALKER, JR., Circuit Judge.

Plaintiff-appellant Margaret Gwozdzinsky appeals from a judgment of the United States District Court for the Southern District of New York (John E. Sprizzo, Judge)

granting summary judgment in favor of defendant-appellee Zell/Chilmark Fund, L.P. ("Zell/Chilmark") and denying Gwozdzinsky's cross-motion for summary judgment in an action filed by Gwozdzinsky under Section 16(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78p(b). See *Gwozdzinsky v. Zell/Chilmark Fund L.P.*, 979 F.Supp. 263 (S.D.N.Y.1997). Gwozdzinsky seeks disgorgement of profits allegedly realized by Zell/Chilmark under two standby purchase agreements it entered into with nominal defendant-appellee Revco D.S., Inc. ("Revco") in connection with two pro rata rights offerings Revco made to all of its shareholders. We affirm.

## BACKGROUND

Revco, one of the largest drug retail chains in the United States, is a Delaware corporation with its principal place of business in Ohio. Revco's common stock trades on the New York Stock Exchange. Gwozdzinsky is a Pennsylvania resident who owns Revco common stock. Zell/Chilmark is an investment fund that owns roughly twenty percent of Revco's outstanding common stock and is controlled by Samuel Zell and David Schulte. At all relevant times, both Zell and Schulte were members of Revco's Board of Directors and Zell was Co–Chairman of Revco's Executive Committee.

On June 1, 1992, Revco emerged from bankruptcy under a plan of reorganization which required, inter alia, that Revco issue an aggregate of $433.2 million in debt securities with interest rates of eleven percent or higher. Subsequently, in order to reduce its interest expenses and improve its debt-to-equity ratio, Revco adopted a recapitalization plan that included raising $110 million in equity through the sale of 13,750,686 shares of common stock in a pro rata rights offering to shareholders of record on December 28, 1992 (the "1992 Rights Offering"). Under the 1992 Rights Offering, a shareholder would receive 0.384 rights for each share of Revco common stock owned. One full right entitled a shareholder to buy one share of Revco common stock for $8.00 per share. In addition, an oversubscription privilege was available to each shareholder who exercised all of her accumulated rights, enabling the shareholder to purchase, at $8.00 per share, additional unsubscribed shares on a pro rata basis up to the number of rights the shareholder exercised.

To ensure that the 1992 Rights Offering would raise $110 million in equity, on December 15, 1992, Revco entered into a Standby Purchase Agreement (the "1992 Standby Purchase Agreement") with Zell/Chilmark and Magten Asset Management, Inc. ("Magten") whereby the latter parties agreed that they would (a) exercise all of the rights and oversubscription privileges distributed to them under the 1992 Rights Offering and (b) purchase, at $8.00 per share, any shares that remained unsold (the "Remaining Shares"), up to an aggregate cost of $150 million. As compensation for assuming these obligations, Zell/Chilmark and Magten received a standby purchase fee of $1,452,448 from Revco, of which Zell/Chilmark's portion was $841,265. Revco specified the terms of both the 1992 Rights Offering and the 1992 Standby Purchase Agreement in a prospectus dated December 17, 1992.

In January 1993, Zell/Chilmark exercised its rights under the 1992 Rights Offering by purchasing 2,706,558 shares of Revco common stock pursuant to its accumulated rights and 134,982 shares pursuant to its oversubscription privilege. That same month, Zell/Chilmark purchased an additional 517 shares of Revco common stock pursuant to its obligations under the 1992 Standby Purchase Agreement. In September 1993, Zell/Chilmark purchased an additional 17,153 shares pursuant to the oversubscription privilege and an additional 12,912 shares pursuant to its obligations under the 1992 Standby Purchase Agreement. In compliance with Section 16(a) of the Exchange Act, see 15 U.S.C. § 78p(a), Zell/Chilmark disclosed all of these purchases to the Securities and Exchange Commission ("SEC") in its 1993 Form 4 filing.

In 1994, Revco effected a second pro rata rights offering (the "1994 Rights Offering") in order to finance its proposed acquisition of another retail drug chain. While the structure of the 1994 Rights Offering was similar to that of the 1992 Rights Offering, Revco's

common stock had appreciated considerably since 1992. Each shareholder received 0.305 rights for each share of Revco common stock owned. A full right entitled a shareholder to buy one share of the 15,500,000 shares of Revco common stock offered at a price of $14.00 per share, for a total of $217 million in equity. As with the 1992 Rights Offering, an oversubscription privilege was available to each shareholder who had exercised all rights available under the 1994 Rights Offering.

On June 8, 1994, Revco entered into a second Standby Purchase Agreement with Zell/Chilmark (the "1994 Standby Purchase Agreement"), the terms of which were disclosed together with the terms of the 1994 Rights Offering in a prospectus issued the following day. Zell/Chilmark received a standby purchase fee of $2,839,058 in exchange for once again agreeing to (a) exercise all of the rights distributed to it under the 1994 Rights Offering, including those offered under the oversubscription privilege, and (b) purchase any Remaining Shares for $14 per share.

Zell/Chilmark exercised its rights under the 1994 Rights Offering on July 7, 1994, by purchasing 3,025,738 shares of Revco common stock under its accumulated rights and 153,511 shares pursuant to its oversubscription privilege. It purchased an additional 2,589 shares at a price of $14.00 per share in accordance with its obligations under the 1994 Standby Purchase Agreement. Zell/Chilmark disclosed these purchases to the SEC in a Form 4 filing on July 27, 1994, and in an amendment to that filing on January 9, 1995. It is undisputed that as of October 17, 1997, the date of the district court's opinion, Zell/Chilmark had not sold any Revco stock.

In December 1995, Gwozdzinsky filed a derivative action in the district court asserting, inter alia, that Zell/Chilmark, as an "insider" of Revco, realized short-swing profits in violation of Section 16(b) of the Exchange Act when it entered into the 1992 and 1994 Standby Purchase Agreements and received standby purchase fees. Gwozdzinsky's claim is premised on the theory that Zell/Chilmark's purchase obligations under the standby purchase agreements were derivative securities that fall within the scope of Section 16(b). Specifically, she argues that the agreements constitute the writing of put options by Zell/Chilmark, thus establishing a "call equivalent position."[1] Gwozdzinsky further asserts that most of these short put options expired or were canceled because Zell/Chilmark was ultimately required to purchase only a relatively small number of shares pursuant to the Standby Purchase Agreements. Accordingly, Gwozdzinsky seeks the return of the 1992 and 1994 standby purchase fees to Revco, pursuant to Rule 16b–6(d).[2]

Gwozdzinsky also argues that even if the standby purchase agreements do not constitute conventional options, we should read Section 16(b)'s definition of derivative securities broadly to include these transactions, which carried the potential for speculative abuse and thus are within the scope of those evils that Congress sought to prevent through Section 16(b). This argument is premised on the fact that both the 1992 and 1994 Rights Offerings were planned and administered while Zell and Schulte, Zell/Chilmark's controlling partners, were members of Revco's Board of Directors (the "Board"), while Zell was Co–Chairman of the Board's Executive Committee, and while Zell/Chilmark owned approximately 20% of Revco's common stock. Thus, according to plaintiff,

---

1. A call equivalent position is a "derivative security position that increases in value as the value of the underlying equity increases, including, but not limited to, a long convertible security, a long call option, and a short put option position." 17 C.F.R. § 240.16a–1(b). Gwozdzinsky contends that even if the standby purchase agreements were not strictly options, they nevertheless satisfy the definition of a call equivalent position because their value was positively correlated with the value of Revco common stock. We need not

address this argument because even if it is true, it would not alter our analysis.

2. Rule 16b–6(d) provides, in relevant part:
    Upon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under section 16(b) of the Act. The profit shall not exceed the premium received for writing the option.
    17 C.F.R. § 240.16b–6(d).

these insiders were able to manipulate the terms of the 1992 and 1994 Rights Offerings using inside information for their own benefit at the expense of the public.

Zell/Chilmark moved for summary judgment on the grounds that (1) the challenged transactions were proper business transactions that neither established "options" nor violated Section 16(b); (2) even if the transactions could be considered "options," there could be no "short-swing" profits because Zell/Chilmark engaged in purchases only, and not sales; (3) the options did not expire but were in fact exercised by Revco when Zell/Chilmark purchased shares pursuant to the standby purchase agreements; and (4) Gwozdzinsky's claim with respect to the 1992 Rights Offering was time-barred by the two-year statute of limitations governing actions under Section 16(b).

Gwozdzinsky cross-moved for summary judgment, claiming that Section 16(b) applied to Zell/Chilmark's transactions and that her claim with respect to the 1992 Rights Offering was not time-barred because Zell/Chilmark's improper Form 4 disclosure tolled the statute of limitations.

In entering summary judgment in favor of Zell/Chilmark, the district court rejected Gwozdzinsky's argument that the Zell/Chilmark transactions fell within the scope of Section 16(b), finding that (1) the standby purchase agreements were not options; (2) even if they were options, they were exercised and did not expire; and (3) this was not the sort of transaction that was subject to speculative abuse. See *Gwozdzinsky*, 979 F.Supp. at 266–68. On appeal, Gwozdzinsky argues that the district court's findings were erroneous as a matter of law.

## DISCUSSION

Section 16(b) of the Exchange Act seeks to deter "insiders,"[3] who are presumed to possess material information about the issuer, from using such information as a basis for purchasing or selling the issuer's equity securities at an advantage over persons with whom they trade. See 15 U.S.C. § 78p. The statute requires disgorgement to the company of any profit derived from the matching of any purchase and any sale of an "equity security" (other than an exempted security) within a six-month period by a statutory insider, irrespective of intent or whether overall trading during that six months (i.e., all sales and purchases combined) resulted in a loss. Suits can be maintained either by the company or derivatively by a shareholder. *Id.*

In 1991, the SEC revised the Section 16 regulatory scheme to include rules governing the reporting of and liability for transactions in derivative securities, including options, warrants, convertible securities, stock appreciation rights, and similar securities with a value derived from the value of an equity security. See Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 28,-869, [1990–91 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 84,709, at 81,261 (Feb. 8, 1991) ("Release 28,869"); *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 321–22 (2d Cir.1998). The result of these amendments is to make "holding derivative securities . . . functionally equivalent to holding the underlying equity securities." Release 28,869, *supra*, at 81,258; see also 17 C.F.R. § 240.16a–1(c) (defining "equity security" to include derivative securities).

Regardless of whether a claim concerns derivative securities, equity securities, or some combination of the two, however, liability under Section 16(b) does not attach unless the plaintiff proves that there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period. See *Newmark v. RKO Gen., Inc.*, 425 F.2d 348, 354 (2d Cir. 1970); see also *Magma Power*, 136 F.3d at 322; *Citadel Holding Corp. v. Roven*, 26 F.3d 960, 963–64 (9th Cir.1994).

In the case of derivative securities, the SEC has defined the terms "purchase" and

---

3. "Insiders" are defined under the statute as an issuer's directors and officers and any persons who own more than ten percent of any class of the issuer's non-exempt, registered equity securities. See 15 U.S.C. § 78p.

"sale" broadly. See, e.g., 17 C.F.R. § 16(b)–6(a). Thus, under Rule 16b–6(d), any insider who writes a put option on securities of the issuer is liable under Section 16(b) to the extent of any premium received for writing the option if the option is either canceled or expires unexercised within six months of its writing, an event that is deemed a "sale" for purposes of Section 16(b). See 17 C.F.R. § 16b–6(d). This rule is designed to prevent a scheme whereby an insider with inside information favorable to the issuer writes a put option, and receives a premium for doing so, knowing, by virtue of his inside information, that the option will not be exercised within six months.

Because we find that there was no expiration or cancellation of whatever option Zell/Chilmark may have written, and there was indisputably no "sale" in the traditional sense of the word, we hold that Gwozdzinsky has failed to state a claim under Section 16(b).

## I.

There is no dispute that Zell/Chilmark is a statutory insider. Gwozdzinsky asserts that the purchase requirement is satisfied because the standby purchase agreements were in reality derivative securities amounting to the writing of a put option, thus establishing a call equivalent position, and under Rule 16b–6, "[t]he establishment of or increase in a call equivalent position ... shall be deemed a purchase of the underlying security for purposes of section 16(b)." See 17 C.F.R. § 240.16b–6(a).

The district court held that the agreements were not options on two separate grounds. First, the district court held that because both Revco and Zell/Chilmark were obligated to perform, these transactions are inconsistent with the nature of an option, which imposes no obligation on the optionee. Second, the district court held that an instrument can be considered an "option" only if its quantity and price have been determined at the time of the transaction. Here, however, the exact number of shares that Zell/Chilmark was obligated to purchase was unknown at the time those agreements were executed and neither party could control how

many shareholders would exercise their accumulated and oversubscription rights pursuant to the rights offerings. See *Gwozdzinsky*, 979 F.Supp. at 266–67.

While we are inclined to agree with the district court's reasoning, we need not decide whether or not the Standby Purchase Agreements constituted derivative securities because we find that Gwozdzinsky cannot establish the other elements of her claim.

## II.

■ Liability under Section 16(b) requires both a purchase and a sale within a six-month period. See 15 U.S.C. § 78p(b). It is undisputed that Zell/Chilmark did not sell, in any conventional sense, Revco stock within six months of entering into the Standby Purchase Agreements or of purchasing shares under the Rights Offerings and Standby Purchase Agreements. Gwozdzinsky contends that because Zell/ Chilmark ultimately purchased only a relatively small number of shares under the Standby Purchase Agreements, most of the "options" expired or were canceled. Thus, according to plaintiff, Revco is entitled to recover the standby purchase fees under Rule 16b–6(d), which provides that "[u]pon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under Section 16(b) of the Act. The profit shall not exceed the premium received for writing the option." See 17 C.F.R. § 240.16b–6(d). This argument is without merit.

The fatal flaw in Gwozdzinsky's logic is that even if the standby purchase agreements were options, they did not apply to all of the shares involved in the Rights Offering. Rather they only applied to Zell/Chilmark's subscription and oversubscription rights and the Remaining Shares, which as defined were necessarily the shares remaining after all the other shareholders exercised their rights. Since Zell/Chilmark exercised all of its subscription rights and purchased all of the Remaining Shares, no options expired and, thus, there is no liability under Rule 16b–6(d).

310

## III.

■ Finally, we reject Gwozdzinsky's attempt to bring this transaction within the ambit of Section 16 by invoking the policy argument that it is the type of speculative, short-term profit-taking the statute was designed to prevent. This "policy argument" turns case law on its head. The statute, as written, establishes strict liability for all transactions that meet its mechanical requirements. When courts have looked to policy, it was to avoid the sometimes harsh results of this inflexible rule.

In *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 595, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973), the Court, recognizing the overbreadth of Section 16(b), held that "under the[ ] strict terms [of Section 16(b) ], the prevailing view is to apply the statute only when its application would serve its goals." In the wake of Kern, courts have looked into the substance of borderline transactions alleged to have violated Section 16(b) to determine whether in fact the transaction contravened the underlying rationale of the section (i.e., presented the potential for speculative abuse of inside information), and, where the possibility of speculative abuse was not shown, to refuse to impose liability even though there was arguably a matching purchase and sale by an insider within six months. See, e.g., *id.* at 600, 93 S.Ct. 1736 (profit made by 10% beneficial owner on option did not fall within Section 16(b) because owner did not have access to inside information); *Blau v. Lamb*, 363 F.2d 507, 518–21 (2d Cir.1966) (conversion did not fall within Section 16(b) because it was not one that involved speculative abuse).

In Newmark, we held that with respect to "unorthodox" transactions, the potential for speculative abuse is a threshold issue to be decided before it is even necessary to determine if the transaction falls within the scope of Section 16(b). 425 F.2d at 351. As the Newmark court made clear, however, even if a transaction is found to present the opportunity for speculative abuse, there can be no liability under Section 16(b) unless the statutory requirements are also met. *Id.* at 354. Indeed, if speculative abuse alone were enough to invoke liability, then the more conventional purchases and sales that take place within six months and a. day would result in liability, which plainly they do not.

Thus, the policy arguments invoked by Gwozdzinsky constitute a rule of exclusion from liability, not a rule of inclusion. Because we have already found that the transactions at issue here did not fall within the scope of Section 16(b), we need not determine whether they presented opportunities for speculative abuse.

## CONCLUSION

For the reasons set forth above, we affirm the judgment of the district court granting summary judgment in favor of Zell/Chilmark.