**12-2509-cv**
**Roth v. The Goldman Sachs Group, Inc., et al.**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: May 8, 2013                    Decided: January 29, 2014)

Docket No. 12-2509-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANDREW E. ROTH, DERIVATIVELY ON BEHALF OF LEAP WIRELESS
INTERNATIONAL, INC.,

        Plaintiff-Appellant,

            v.

THE GOLDMAN SACHS GROUP, INC., GOLDMAN, SACHS & CO., LEAP
WIRELESS INTERNATIONAL, INC.,

        Defendants-Appellees.


- - - - - - - - - - - - - - - - - -- - - - - - - - - - - - - - -

B e f o r e:   WINTER, CABRANES, and LIVINGSTON, Circuit Judges.

    Appeal from a judgment of the United States District Court
for the Southern District of New York (J. Paul Oetken, Judge),
dismissing appellant's derivative action for failure to state a
claim.  Appellant sought to hold appellees liable for failing to
disgorge "short-swing profits" as required by Section 16(b) of
the Securities Exchange Act and Securities and Exchange
Commission Rule 16b-6(d).  Appellees were statutory insiders when
they wrote call options but not when the same options expired
less than six months later.  We affirm.

GLENN OSTRAGER (Paul D. Wexler, Kornstein Veisz Wexler & Pollard LLP, on the brief), Ostrager Chong Flaherty & Broitman P.C., New York, NY, for Plaintiff-Appellant.

LAWRENCE T. GRESSER (Daniel H. Tabak & Alexis G. Stone, on the brief), Cohen & Gresser LLP, New York, NY, for Defendants-Appellees.

Geoffrey F. Aronow, Michael A. Conley, Jacob H. Stillman, John W. Avery, Benjamin M. Vetter, Securities and Exchange Commission, Washington, D.C., for Amicus Curiae Securities and Exchange Commission.

WINTER, Circuit Judge:

Andrew Roth appeals from Judge Oetken's dismissal under Fed. R. Civ. P. 12(b)(6) of his derivative action on behalf of Leap Wireless International, Inc. ("Leap"). He seeks to hold the Goldman Sachs Group and its wholly owned subsidiary Goldman, Sachs & Co. (collectively, "Goldman") liable under Section 16(b) of the Securities Exchange Act ("Exchange Act")[1] and Rule

---

[1] Section 16(b) provides:
    (b) Profits from purchase and sale of security within six months

    For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years

16b-6(d)[2] for their failure to disgorge "short-swing profits" derived from writing call options on Leap stock.

Although Section 16(b) is long in the tooth -- older even than the author of this opinion -- and the subject of countless judicial interpretations, it seems to be an ever-growing fount of close questions as to its meaning. The issue here arises from the fact that Goldman owned over ten percent of Leap's equity shares -- a statutory insider under Section 16(b) -- when it wrote certain call options, but owned under ten percent when the unexercised options expired less than six months later. The principal issues are whether: (i) a call option's expiration within six months of its writing constitutes a "purchase" for Section 16(b) purposes that can be matched to the "sale" that is deemed under Rule 16b-6(a) to occur at the option's writing; and (ii) if so, whether the loss of statutory insider status before the expiration eliminates the need for disgorgement under Section 16(b). Concluding the expiration was a "purchase" but that the

---

after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security or security-based swap agreement or a security-based swap involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.
15 U.S.C. § 78p(b).

[2] Rule 16b-6(d) provides:
(d) Upon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under section 16(b) of the Act. The profit shall not exceed the premium received for writing the option. The disposition or closing of a long derivative security position, as a result of cancellation or expiration, shall be exempt from section 16(b) of the Act where no value is received from the cancellation or expiration.
17 C.F.R. § 240.16b-6(d).

Goldman defendants were not statutory insiders at the time of the "purchase," the district court held that Goldman was not required to disgorge any profits. We affirm.

BACKGROUND

Appellant's complaint alleges the following. Goldman owned common stock in Leap. On September 30, 2009, Goldman's ownership stake in the company surpassed ten percent, rendering it a statutory insider subject to the reporting and disgorgement requirements of Section 16.[3] On the same date, Goldman wrote 32,000 call options that covered 3.2 million shares of Leap and were exercisable at $39/share. The options were sold at $0.33/share for a total of $1,056,000 and bore an expiration date of January 16, 2010. On October 2, 2009, Goldman's disposal of Leap shares dropped its ownership stake below ten percent.

In an October 6, 2009, e-mail message to Leap, Goldman disclosed that it had generated profits from purchases and sales of Leap securities unrelated to the options described above during the period when Goldman was a statutory insider. Pursuant to Section 16(b), Goldman (voluntarily) disgorged to Leap the

---

[3] Section 16 applies to "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security" of the issuer. 15 U.S.C. § 78p(a). Under Rule 16a-1(a), the definition of beneficial owner is found in Section 13(d) of the Exchange Act and accompanying rules. Under Section 13(d)(3), see id. § 78m(d)(3), "[w]hen two or more persons act as a . . . group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection." Appellant's complaint alleges that the Goldman appellees-defendants constitute such a "group." Because we are reviewing a dismissal under Fed. R. Civ. P. 12(b)(6), we must, therefore, assume that Goldman is a group subject to the statute's requirements.

4

profits -- totaling about $203,000 -- derived from these transactions.

On January 16, 2010, the call options at issue here expired unexercised.

On June 14, 2011, appellant, a Leap shareholder, made a demand on Leap to sue Goldman under Section 16(b) and Rule 16b-6(d) for Goldman's alleged failure to disgorge profits earned by writing the short call options that expired unexercised within six months. In response, Leap referenced the profits already voluntarily disgorged by Goldman and communicated that it "consider[ed] the matter closed."

Appellant filed the present action on July 13, 2011. Goldman and Leap (the latter as a nominal defendant) moved to dismiss the action for failure to state a claim. The district court granted the motions, holding: (i) Both a purchase and a sale must exist to trigger liability under the statute. Under Section 16(b), the expiration of a short call option constitutes a purchase to be matched with the sale that is deemed to occur when the option is written. (ii) Goldman was a statutory insider only when the options were written, not when they expired. (iii) Goldman was, therefore, not required to disgorge profits earned from writing the options because the statute requires statutory insider status at the time of both purchase and sale. <u>Reliance Elec. Co. v. Emerson Elec. Co.</u>, 404 U.S. 418, 423-25 (1972). Appellant timely appealed.

After the close of briefing but before oral argument, we invited the SEC to submit an amicus curiae brief regarding the merits of the appeal. That brief, when filed, agreed with the district court.

DISCUSSION

"We review a district court's dismissal of a complaint pursuant to Rule 12(b)(6) de novo." Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 91 (2d Cir. 2010).

The question before us is whether, to fall under the disgorgement requirements of Section 16(b) and Rule 16b-6(d), an expiration of a call option is a "purchase" and the writer of a call option must be a ten percent owner both at the time it writes the option and at the time the option expires. We begin with the pertinent statutory and regulatory framework.

a) Section 16(b)

Stated simply, liability under Section 16(b), quoted in Note 1, supra, attaches when "there was (1) a purchase and (2) a sale of securities (3) by . . . a shareholder who owns more than 10 percent of any one class of the issuer's securities (4) within a six-month period." Gwozdzinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305, 308 (2d Cir. 1998). It is intended to "prevent[] the unfair use of information which may have been obtained" by company insiders by requiring that "any profit realized by [the insider] from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted

6

security) . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such [insider]." 15 U.S.C. § 78p(b). Section 16(b) applies to "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security" of the issuer, id. § 78p(a), and states that it "shall not be construed to cover any transaction where [a statutory insider] was not such both at the time of the purchase and sale, or the sale and purchase, of the security . . . involved," id. § 78p(b).

Section 16(b) is generally subject to mechanical application. It "'imposes a form of strict liability' and requires insiders to disgorge . . . 'short-swing' profits 'even if they did not trade on inside information or intend to profit on the basis of such information.'" Credit Suisse Sec. (USA) LLC v. Simmonds, 132 S. Ct. 1414, 1417 (2012), quoting Gollust v. Mendell, 501 U.S. 115, 122 (1991); accord Magma Power Co. v. Dow Chem. Co., 136 F.3d 316, 320-21 (2d Cir. 1998) ("No showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement."). As the Supreme Court has noted, "the only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." Reliance Elec. Co., 404 U.S. at 422.

In the past, the customary mechanical application of Section 16(b) was largely saved from arbitrariness because the underlying rules were discernible and provided predictability.  However, the growing complexities of financial transactions have generated numerous issues of statutory interpretation that admit of no clear resolution.  The courts and the SEC have responded to these developments in two ways.

First, the Supreme Court has permitted a departure from "flat rule[s]" in a very limited number of situations.  For example, it has noted that "[t]he statutory definitions of 'purchase' and 'sale' are broad" and have the potential to "reach many transactions not ordinarily deemed a sale or purchase." Kern Cnty. Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 593-94 (1973).  Given that breadth, "'courts have properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse,'" where the instrument or transaction is "unorthodox" or "borderline."[4]  Id. at 594-95, quoting Reliance Elec. Co., 404 U.S. at 424 n.4.

Second, the SEC has promulgated a substantial number of rules addressing the increasing use of instruments and transactions that do not fit comfortably into Section 16(b)'s simplistic scenario of purchases and sales of common shares.  As explained below, the SEC has promulgated rules governing options of the kind that give rise to the present appeal.

---

[4] This approach has been viewed as very limited by some courts.  See Texas Int'l Airlines v. Nat'l Airlines, Inc. 714 F.2d 533, 539-40 (5th Cir. 1983)(limiting Kern County to forced sales).

b)  SEC Section 16 Rules

A call option is a type of instrument commonly described as a derivative.[5]  Because derivative securities are not explicitly covered by Section 16(b), the SEC adopted Rule 16b-6 in 1991 "to effect the purposes of section 16 and to address the proliferation of derivative securities and the popularity of exchange-traded options."  Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-28869, Investment Company Act Release No. 35-25254, 56 Fed. Reg. 7242, 7248 (Feb. 21, 1991).  The adoption was based on the SEC's conclusion that, because the value of a derivative security is tied to the value of the underlying equity security, "holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of section 16."  Trading in derivatives might, therefore, give rise to speculative abuse.[6]  Id.

Appellant seeks to hold Goldman liable under Rule 16b-6(d), quoted in Note 2, supra.  To reiterate, it provides in relevant part that "if an insider writes an option that expires unexercised within six months and profits from doing so on account of having been paid by the purchaser for a right to buy

---

[5] Derivatives are "financial instruments that derive their value (hence the name) from an underlying security or index."  Magma Power, 136 F.3d at 321.  "An option . . . is a purchased right to buy or sell property at a fixed or floating price . . . .  A call option gives the option holder the right to buy shares of an underlying security at a particular price."  Id. at 321 n.2 (citations omitted).

[6] The SEC now defines "equity security" to mean "any equity security or derivative security relating to an issuer, whether or not issued by that issuer."  17 C.F.R. § 240.16a-1(d).

shares that the purchaser did not exercise, the writer will be held liable." Allaire Corp. v. Okumus, 433 F.3d 248, 252 (2d Cir. 2006). The Rule "is designed to prevent a scheme whereby an insider with inside information favorable to the issuer writes a[n] . . . option, and receives a premium for doing so, knowing, by virtue of his inside information, that the option will not be exercised within six months." Gwozdzinsky, 156 F.3d at 309.

As noted, two transactions -- a sale and a purchase of securities -- are required to trigger liability under Section 16(b), and the status as a statutory insider must exist at the time of each transaction. Reliance Elec. Co., 404 U.S. at 423-25. Rule 16b-6 defines, for the most part, derivative transactions as either sales or purchases for the purposes of the statute. These categorizations are premised on the fact that "[j]ust as an insider's opportunity to profit commences when he purchases or sells the issuer's common stock, so too the opportunity to profit commences when the insider engages in transactions in options or other derivative securities that provide an opportunity to obtain or dispose of the stock at a fixed price." 56 Fed. Reg. at 7248.

For example, Rule 16b-6(a) provides that "the establishment of or increase in a put equivalent position . . . shall be deemed a sale of the underlying securities for purposes of section 16(b) of the Act." 17 C.F.R. § 240.16b-6(a). The definitional section of the regulations explains that writing a fixed-priced call option is functionally the same as taking a "put equivalent

10

position."  Such "a derivative security position . . . increases in value as the value of the underlying equity decreases," because, when the market price of the security is above but dropping close to the strike price, the cost to the writer of selling at the strike price decreases.  17 C.F.R. § 240.16a-1(h). If the market price falls below the strike price, the option holder will not exercise it, and the writer will profit on the premium.  Following the same logic, the regulations provide that "[t]he closing of a derivative security position as a result of its exercise or conversion shall be exempt from the operation of section 16(b) of the Act."  17 C.F.R. § 240.16b-6(b).

But while Rule 16b-6(a) equates the establishment of a put equivalent position to a sale, Rule 16b-6(d) does not identify the events it lists -- the writing and the expiration of the option -- as either purchases or sales.  However, in a release regarding the then-proposed 1991 Amendments to the Section 16 Rules, the SEC stated:  "[a] grant of an option may be viewed as a sale of the derivative security by the writer of the option, if consideration is received for the option."  Ownership Reports and Trading by Officers, Directors and Principal Stockholders, Exchange Act Release No. 34-26333, 53 Fed. Reg. 49997-02, 50009 (Dec. 13, 1988).  In the same release, the SEC noted:  "in the case of an expiration of a short option position, the expiration would be treated as the purchase of the option because there is short-swing profit potential in such a case."  Id. at 50008.  The SEC advances the same view here in its amicus brief.  Important

11

to our disposition of this appeal, therefore, is the deference we must give to an agency's interpretation of its own regulations -- as expressed here in the SEC Release quoted above and in its amicus brief -- unless the proffered interpretation is "plainly erroneous or inconsistent with the regulations." See Auer v. Robbins, 519 U.S. 452, 461-63 (1997) (internal quotation marks omitted); accord Press v. Quick & Reilly, Inc., 218 F.3d 121, 128-29 (2d Cir. 2000).

c) Application

Although neither party contests that the writing of a call option constitutes a sale under Section 16(b), see, e.g., Gwozdzinsky, 156 F.3d at 309, both challenge the district court's holding that a short call option's expiration amounts to a Section 16(b) purchase by the option writer. The parties claim instead that the passive expiration of a short call option is a statutory nonevent in all cases under the statute; this conclusion, they argue, is compelled by our holdings in Magma Power and Allaire.

While the parties agree on this premise, each nevertheless argues for a different outcome. Acknowledging that two separate transactions are necessary elements of Section 16(b)'s disgorgement requirement, Goldman invites us to invalidate the portion of Rule 16b-6(d) that pertains to short call option expirations.[7] Appellant, on the other hand, argues that the

_____

[7] Of course, Goldman also argues that, if we find that the expiration of an option under Rule 16b-6(d) is a Section 16(b) purchase, it cannot be held liable because it was no longer a statutory insider at the time of the options' expiration. We agree with that proposition. See infra.

writing of a short call option constitutes a simultaneous sale and purchase under the statute, based on a theory that the writer commits itself to a subsequent purchase of the underlying stock at the instant it takes a short position on a call option. According to appellant, then, because Goldman was a statutory insider when the options were written -- at the time of the asserted simultaneous sales and purchases -- for Section 16(b) purposes, it is of no consequence that Goldman was not a statutory insider at the time of the option's expiration.

However, both parties misconstrue our precedents, and we adopt the district court's holding and the SEC's interpretation: for purposes of Section 16(b), the expiration of a call option within six months of its writing is to be deemed a "purchase" by the option writer to be matched against the "sale" deemed to occur when that option was written.  Rule 16b-6(d) was adopted to eliminate the potential that an insider/option-writer could generate profits by "knowing, by virtue of his inside information, that the option will not be exercised within six months."  Gwozdzinsky, 156 F.3d at 309.  When an insider sells a call option, and that same option expires unexercised less than six months later, the writer's opportunity to profit on the underlying stock is realized.  It is for this reason that the SEC determined, "in the case of an expiration of a short option position, the expiration would be treated as the purchase of the option."  53 Fed. Reg. at 50008.  We follow that resolution of the issue.

13

Neither Magma Power nor Allaire mandates a different result. In Magma Power, we concluded that an option holder's decision not to exercise an option to buy stock does not constitute a transaction by the option holder for the purposes of the statute.[8] 136 F.3d at 324-25. Goldman is not the option holder, however, but the option writer. While the option holder's decision not to purchase shares may not constitute a transaction on the part of the option holder, we have never held as much with respect to the option writer.

Nor does Allaire, an opinion regarding the application of Rule 16b-6(a), control our decision. In Allaire, the defendants wrote call options on Allaire stock prior to becoming statutory insiders. Thereafter, the defendants acquired enough shares to push their ownership stake above ten percent. The original options then expired unexercised (just one month after they were written). About a month later, while the defendants were still insiders, they wrote a new set of call options on Allaire stock. 433 F.3d at 249.

Allaire argued that, under Rule 16b-6(a), the expiration of the initial set of options constituted a "purchase" of the stock

---

[8] The particular option in Magma Power referenced by the parties was a floating-price-option component that was part of a more complex instrument (the "Note"), and was retained by the insider after it sold the Note. The Note itself included a call option that could be exercised by the Note holder. The component the insider retained allowed it, when the Note holder decided to exercise its option, either to reacquire shares by paying the Note holder the shares' market value in cash, or to fulfill the Note holder's call with shares. 136 F.3d at 324-25. The insider fulfilled its obligation on the Note with shares rather than cash -- that is, deciding not to exercise its option to purchase shares. Id. After a thorough analysis, we determined that the insider's decision to not repurchase shares was not the equivalent of a purchase under 16b-6(a).

14

because "it represents a liquidation of or decrease in a put equivalent position"; the second set of options then, when written, amounted to the establishment of a new put equivalent position -- a sale that, according to Allaire, could be matched to the purported purchase. Id. at 249, 251. We held that the expiration of the first set of options did not constitute a purchase under Section 16b-6(a) matchable to the later sale of a different set of call options. Id. at 252.

When read out of that context, there is language in Allaire that would seem in tension with our conclusion that the expiration of a call option under Rule 16b-6(d) constitutes a purchase by the option writer. But we reiterate, to the extent that Allaire did not make it clear, that this language applies only to short call option expirations under Rule 16b-6(a). Indeed, "[t]he principal issue" in Allaire was "whether, under Rule 16b-6(a), the expiration of a short call option is a purchase, thereby exposing its insider/writer to section 16(b) liability if within six months after that expiration he or she also wrote (sold) another such call option." Id. at 251 (emphasis added).

Given the facts of Allaire, there are sound reasons to view our holding there as limited to call-option expirations under Rule 16b-6(a). The danger of misuse of non-public information exists at the time the option is written, and the expiration of that option is the moment of profit. Matching writings with expirations of different options does not clearly advance the

15

purposes of the statute. Options written at different times are less likely to give rise to speculative abuse, and matching the expiration of an option only to its own writing recognizes the more evident danger.

The Allaire opinion itself makes this clear. For example, we observed that, under Rule 16b-6(a), "when the option is written by the insider (and not canceled), leaving the insider with no control over whether or not it will be exercised, his or her inside information, at least in the usual case, cannot be employed for his or her personal profit." Id. at 252. We concluded, "neither the holder's exercise of the option nor the holder's allowing the option to expire constitutes a transaction by the option's writer." Id. Moreover, at several junctures, Allaire was careful to note that its holding applied only to option expirations under Rule 16b-6(a). See id. ("Just as the holder's exercise of a call option is not a 'sale' by the writer under Rule 16b-6(a), neither is the expiration of a call option a 'purchase' by the writer under that provision." (emphases added)); id. at 253("If the expiration of a call option were a purchase under Rule 16b-6(a), what purpose would it serve to provide, as Rule 16b-6(d) does, that the expiration of an option within six months of its writing triggers liability?"); id. at 254 ("[T]he writing of an option may be a 'transaction' under section 16(b) but . . . the expiration of an option, when matched against any transaction other than its own writing, is not." (emphasis added)).

16

<u>Allaire</u>'s express and implied references to Rule 16b-6(d), therefore, beg the question we answer:  when matched against its own writing, the expiration of an option within six months is a "transaction" -- a purchase by the option writer -- for the purposes of Section 16(b).

Appellant's theory -- that the writing of an option constitutes a simultaneous purchase and sale -- finds support neither in the statutory text, the SEC Rules, nor in our precedents.  Section 16(b) plainly requires separate transactions.

To the extent appellant argues that the broad, statutory definitions of "purchase" and "sale" encompass the circumstances here -- essentially that both definitions should apply to the transaction that occurs when the option is written to effectuate the purposes of the statute -- that argument is contrary to the statutory text, which is clearly addressed to separate transactions.  Moreover, it ignores the real possibility that the holder will exercise the option.  Most importantly, the SEC undertook this identical inquiry when it promulgated Rules establishing that there are two relevant transactions at separate points in time:  the writing of the option and its expiration.[9]

---

[9] Appellant cites to several district court cases in support of his simultaneous purchase and sale theory, none of which are persuasive.  <u>See, e.g.</u>, <u>Matas v. Siess</u>, 467 F. Supp. 217 (S.D.N.Y. 1979) (exercise of stock appreciation rights for cash under company plan was an unorthodox transaction that the court treated as both a purchase and sale for purposes of Section 16(b), where defendants timed the exercise to maximize the difference, which they received in cash, between the option price and the market price on the date of exercise).

While the SEC's resolution may not be the only reasonable one, it is certainly within the realm of reason, and we defer to it. Press, 218 F.3d at 128-29. Section 16(b) was written to govern a financial world of largely square pegs and square holes. The growing use of oval, rectangular, triangular, star-like, etc. pegs, creates problems without clear solutions. We are not free to reject the SEC's view as to the most desirable, if not perfect, solution to particular issues.

In that regard, appellant warns of the dangers associated with the holding we now adopt, cautioning that a statutory insider can simply write an option and then divest himself of shares enough that he is no longer subject to Section 16(b)'s disgorgement requirements. However, this argument is foreclosed by Reliance Electric, which allowed a statutory insider to purposefully drop its holdings to slightly under ten percent so as to sell the remainder without liability under Section 16(b). When it enacted Section 16(b), "Congress did not reach every transaction in which an investor actually relies on inside information." Reliance Elec. Co., 404 U.S. at 422. For example, the statute "clearly contemplates that a statutory insider might sell enough shares to bring his holdings below ten percent, and later -- but still within six months -- sell additional shares free from liability under the statute," id. at 423, creating the very situation of which appellant calls upon us to be apprehensive. As in the case of structured transactions designed to drop below ten percent, we must also follow the instruction

that "[l]iability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under [Section] 16(b)."  Id. at 422.

The prophylactic disgorgement rule of Section 16(b) is not an all-encompassing remedy for every occasion when insiders succeed in writing options and disposing of stock in a way that allows a profit based on inside information.  Section 16(b) requires that a statutory insider must have such status at the time of the sale and the purchase of securities in order to be liable.  Therefore, to be liable, Goldman had to have been a statutory insider both at the time of the option's writing and at the time of its expiration.  Because Goldman was no longer a statutory insider at the time the options expired in January 2010, it is not liable.

CONCLUSION

To summarize:

(1) For purposes of Section 16(b), the expiration of a call option within six months of its writing is to be deemed a "purchase" by the option writer to be matched against the "sale" deemed to occur when that option was written.

(2) Section 16(b) requires statutory insider status at the time of both purchase and sale, and so Goldman was not required to disgorge profits where it was a statutory insider only when the options were written, but not when they expired.

For the reasons stated above, we affirm the June 8, 2012, judgment of the district court.

19