12-1769-cv
Chechele v. Sperling

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2012

(Argued: March 12, 2013    Decided: July 11, 2014)

Docket No. 12-1769-cv

------------------------------------------------------x

DONNA ANN GABRIELE CHECHELE,

    Plaintiff-Appellant,

-- v. --

JOHN G. SPERLING, PETER V. SPERLING,

    Defendants-Appellees,

APOLLO GROUP, INC.,

    Nominal Defendant-Appellee.

------------------------------------------------------x

B e f o r e :   WALKER, WESLEY, and HALL, Circuit Judges.

    Plaintiff-Appellant Donna Ann Gabriele Chechele appeals from the judgment of the United States District Court for the Southern District of New York (Paul A. Crotty, Judge) granting Defendants-Appellees' motion to dismiss.  Specifically, the district court found that the requirements of a claim under section 16(b) of the Securities Exchange Act of 1934, mandating disgorgement of short-swing profits by statutory insiders, had not been satisfied.

AFFIRMED.

JAMES A. HUNTER, Hunter & Kmiec, New York, NY, for Plaintiff-Appellant.

DENNIS H. TRACEY, III (Nathaniel E. Marmon, on the brief), Hogan Lovells US LLP, New York, NY, for Defendants-Appellees.

JOHN M. WALKER, JR., Circuit Judge:

Plaintiff-Appellant Donna Ann Gabriele Chechele appeals from the judgment of the United States District Court for the Southern District of New York (Paul A. Crotty, Judge) granting insider Defendants-Appellees' motion to dismiss her short-swing trading complaint. Specifically, the district court found that the requirements of a claim under section 16(b) of the Securities Exchange Act of 1934 ("Exchange Act"), mandating disgorgement of short-swing profits by statutory insiders, had not been satisfied. We agree and affirm the district court's judgment.

                              BACKGROUND

Appellant Chechele is a shareholder of Apollo Group, Inc. ("Apollo"). Appellees John and Peter Sperling, father and son, are the Executive Chairman and Vice Chairman of Apollo's Board of Directors, respectively. Chechele sued the Sperlings under section 16(b) of the Exchange Act, 15 U.S.C. § 78p(b), seeking disgorgement of alleged short-swing profits. Short-swing profits are realized under section 16(b) when an insider buys and sells stock of his company within a six-month period. It is undisputed that the Sperlings are insiders for the purposes of section 16(b).

2

As insiders, John and Peter Sperling had considerable holdings of Apollo stock. In order to convert some of their shares of Apollo Class A common stock into cash, in 2006 and 2007, John Sperling entered into two prepaid variable forward contracts ("PVFCs") and Peter Sperling entered into three PVFCs. The terms of each PVFC were contained in three documents: (1) a Master Agreement, (2) a Pledge Agreement, and (3) a Transaction Confirmation.

The Master Agreements provided the general framework for the PVFC transactions.[1] On the "Payment Date," the banks would pay John and Peter an agreed-upon amount of cash. In exchange, the Sperlings promised to deliver to the banks, on a pre-determined "Settlement Date," some number of Apollo shares, or their cash equivalent. The number of shares to be delivered varied with the market closing price of Apollo stock three days prior to the Settlement Date according to a formula provided in each agreement.

Additionally, on the Payment Date, the Sperlings pledged as collateral the maximum number of shares that could be delivered under the agreement to secure the banks' interest in the shares. In the meantime, however, the Sperlings retained ownership of the shares until delivery on the Settlement Date; they continued to

---

[1] John and Peter Sperling each signed a "master stock purchase agreement" with Bank of America. Peter also signed an equivalent agreement with Deutsche Bank, labelled the "forward purchase contract," which along with the master stock purchase agreements are collectively referred to as the "Master Agreements."

have the right to exercise the shares' voting rights and receive cash dividends.

The particulars of each PVFC transaction, including the Payment Date, upfront cash payment amount, number of pledged shares, Settlement Date, and settlement formula, were all set forth in the Transaction Confirmation. For example, John Sperling's July 11, 2007 Transaction Confirmation called for him to pledge one million shares on July 16, 2007 (the Payment Date) in return for approximately $52.4 million from Bank of America. The Settlement Date occurred approximately eighteen months later, on January 12, 2009.

Under the settlement formula in this transaction, if the share price three trading days prior to settlement (the "Maturity Date") fell below $60.2235 (the "floor price"), John was required to deliver all of the pledged shares or a cash equivalent. The floor price protected John from a decline in the stock price because he was required to deliver one million shares (or the cash equivalent) regardless of how much below the floor price the share price fell.

But if the share price at the Maturity Date was between the floor price and $78.2906 (the "ceiling price"), the number of shares to be delivered would decline as the share price rose above the floor price according to a formula that maintained a constant cash equivalent value. John would keep any undelivered shares.

4

If the share price at the Maturity Date was above the ceiling price, however, the number of shares to be delivered would increase according to a formula under which John had to deliver more shares as the stock price rose. But, no matter how high the stock price climbed, John never had to deliver more than the one million originally pledged shares.[2]

The transaction could be viewed as a bet on whether the share price would be above the ceiling price (bank's bet) or below the floor price (John's bet) on the Maturity Date. John would "win the bet" if the settlement price was below the floor, because he would be satisfying his obligation to the bank with relatively inexpensive shares. The bank would "win the bet" if the settlement price was above the ceiling, because it would receive an increasing number of shares of increasing value. For settlement prices in between the floor and ceiling, the transaction resembled a loan; John borrowed $52.4 million from the bank on the Payment Date and was obligated to pay the bank back approximately $62 million (the $52.4 million he borrowed plus the implied financing cost of the loan).

---

[2] We have represented this PVFC's formula graphically at the end of this opinion. As one can see, the value John delivered to the bank rises steadily as the share price rises, until it reaches the floor price. The value then remains constant, until the share price reaches ceiling price, at which point the value delivered rises again.

On January 9, 2009, the share price was \$85.3300—above the ceiling—so the bank "won" the bet and John had to deliver some, but not all, of the pledged shares on January 12.

All five PVFC transactions were settled by delivery of shares rather than the cash equivalent. The following charts summarize their terms.

### John Sperling

| Trade Date | Maturity Date | Pledged Shares | Floor Price | Ceiling Price | Settlement Price | Delivered Shares | Undelivered Shares |
|---|---|---|---|---|---|---|---|
| 7/11/07 | 1/9/09 | 1,000,000 | 60.2235 | 78.2906 | 85.3300 | 788,300 | 211,700 |
| 4/24/06 | 4/24/09 | 500,000 | 53.3780 | 80.0670 | 61.1450 | 436,500 | 63,500 |

### Peter Sperling

| Trade Date | Maturity Date | Pledged Shares | Floor Price | Ceiling Price | Settlement Price | Delivered Shares | Undelivered Shares |
|---|---|---|---|---|---|---|---|
| 7/11/07 | 1/9/09 | 1,000,000 | 60.2235 | 78.2906 | 85.3300 | 788,300 | 211,700 |
| 4/24/06 | 4/24/09 | 500,000 | 53.3780 | 80.0670 | 61.1450 | 436,500 | 63,500 |
| 1/19/06 | 1/20/09 | 315,000 | 55.3064 | 71.8983 | 86.5400 | 254,606 | 60,394 |

## THE CLAIM IN THE DISTRICT COURT

Within six months of the settlement of the PVFC transactions at issue, the Sperlings sold some of their Apollo stock on the open market. Chechele alleges that those sales, in light of the PVFC settlement, violated section 16(b). According to her theory of the case, the Sperlings sold the shares they pledged to the banks on the Payment Dates of the PVFCs, but then "repurchased" the undelivered shares on the Settlement Dates. She claims that their subsequent sales of company stock on the open market – less than

6

six months after the PVFC's settled - can be matched to the

"purchase" that occurred at settlement. If she is correct, any

profits made from the later sales must be disgorged as short-swing

profits under section 16(b).

The district court concluded that because the "Sperlings'

rights 'became fixed and irrevocable' at the time they entered into

the [PVFCs] . . . the repurchases of the [Sperlings'] retained

shares on the settlement date did not constitute a 'purchase' under

Section 16(b)." Chechele v. Sperling, No. 11 Civ. 0146, 2012 WL

1038653, at *5 (S.D.N.Y. Mar. 29, 2012).

**DISCUSSION**

Chechele raises only one issue on appeal: whether the

Sperlings' retention of a portion of the shares that were pledged

but not delivered to the banks constituted a "purchase" of company

stock within the meaning of section 16(b) of the Securities

Exchange Act. We review de novo the district court's grant of a

motion to dismiss under Federal Rule of Procedure 12(b)(6),

Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 107 (2d Cir.

2012), and conclude that the Sperlings' ultimate retention of

shares pledged to the banks in the various PVFC transactions did

not constitute "purchases" under section 16(b).

In relevant part, section 16(b) states:

> [A]ny profit realized by [a corporate insider]
> from any purchase and sale, or any sale and
> purchase, of any equity security. . . within
> any period of less than six months . . . shall

7

> inure to and be recoverable by the issuer, irrespective of any intention on the part of [the insider].

15 U.S.C. § 78p(b). We have explained that "liability under Section 16(b) does not attach unless the plaintiff proves that there was (1) a purchase and (2) a sale of securities (3) by an [insider] (4) within a six-month period." Gwozdzinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305, 308 (2d Cir. 1998).[3] The only element at issue here is element one: whether a "purchase" occurred when the PVFCs settled and the Sperlings retained some of their pledged shares.[4]

**A. PVFCs are a form of complex derivatives**

The PVFCs at issue here are complex derivatives.[5] On the day the contracts were written, the Sperlings obtained the equivalent of a right to sell a maximum number of shares to the banks, which they would exercise if the share price fell below a floor. Because the value of the Sperlings' right to sell shares would increase as

---

[3] For the purposes of section 16(b) an insider is "an officer or director of the issuer or . . . a shareholder who owns more than ten percent of any one class of the issuer's securities[.]" Gwozdzinsky, 156 F.3d at 308.

[4] We and the parties refer to the transactions here as "PVFCs." This label is useful as far as this transaction goes. We must be cautious, however, not to rely too heavily on labels because the creativity of Wall Street lawyers and bankers is boundless. A future instrument that resembles today's PVFC may contain a heretofore unthought-of contractual term that fundamentally changes the analysis.

[5] Derivatives include, among other things, options to buy or sell securities at particular prices in the future. 17 C.F.R. § 240.16a–1(c).

the price of the stock decreased, the right is a "put equivalent position." 17 C.F.R. § 240.16a-1(h).[6] In exchange for this put equivalent position, the Sperlings granted the banks a right to receive additional shares as the Apollo stock price rose above the PVFC ceiling price. Because the value of the banks' right to receive the pledged shares would increase as the stock price increased, the right is a "call equivalent position." 17 C.F.R. § 240.16a-1(b).[7]

For purposes of our analysis, the initial pledge of shares as collateral is irrelevant; the pledge agreement merely protected the bank against the sale or encumbrance of the shares at risk in the PVFC until the settlement date. And the fact that the transaction

---

[6] A "put option" is a contract giving one party the right to sell, and obligating one party to buy, a stock or commodity at a given price, known as a "strike price," on a particular date. If the market price on that date is below the strike price, then the option becomes valuable because one could purchase the stock in the market and immediately resell it for a profit. See Michael S. Knoll, Put-Call Parity and the Law, 24 Cardozo L. Rev. 61, 70 (2002). We are further convinced that this transaction was a put equivalent by the fact that the potential loss to the bank here if the transaction settled below the floor, and the potential loss to the writer of a traditional put option are nearly identical. Intrigued readers are encouraged to compare our graph of this transaction with Knoll's profit/loss graph of a put option. Id.

[7] A "call option" is a standardized contract giving one party the right to buy, and obligating one party to sell, a stock or commodity at a given price, again a "strike price," on a particular date. If the market price of the stock rises above the strike price, the option becomes valuable because one could exercise the option and immediately sell the purchased shares on the open market at a profit. See Knoll, supra, at 70. Again, comparing our graph of the profit to the bank if this transaction settled above the ceiling with a graph of the profit to the holder of a traditional call option reveals just how much like a call option this transaction was. See id.

resembled a loan at settlement prices between the floor and the ceiling is also irrelevant. Even though no shares changed hands on the Payment Date, rights to an equity security were still bought and sold at the time of the contract.[8]

Were we to confine our focus to the loan aspects of the PVFC, to the exclusion of its option-equivalent elements, we would not only contravene the SEC rules, but also create a new vehicle for insider trading. Suppose an insider anticipated a temporary dip in his company's stock price. The insider could enter into a PVFC with a settlement date during the expected price dip. The insider could then settle in cash, paying the price of the now devalued shares, but retaining the shares themselves for the anticipated upswing in the stock price. When the stock price returned to normal, the insider would have kept his shares and profited by the difference between the up-front payment (based on the normal stock value) and the settlement price (based on the stock value during the market

---

[8] Furthermore, the view that PVFCs are derivatives – not loans – is consistent with every authority revealed by research. First, the SEC treats PVFCs as derivatives. See Exchange Act Release No. 47809, 68 Fed. Reg. 25,788, 25,789 (May 13, 2003) ("In particular, section 16(a) requires insiders to report all security-based swap agreements and transactions involving derivative securities, including . . . forwards . . . ."). Second, two separate district courts have now analyzed PVFCs as derivatives. See Chechele, 2012 WL 1038653; Donoghue v. Centillium Commc'ns Inc., No. 05 Civ. 4082, 2006 WL 775122 (S.D.N.Y. Mar. 28, 2006). Moreover, leading treatises treat PVFCs as derivatives with potential insider-trading implications. See Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide §§ 3.03[2][h], 10.05[3] (4th ed. 2012). Finally, both parties to this litigation go to great lengths to analyze the contracts as transactions in derivative securities.

10

dip).

In this hypothetical, if the PVFC is treated as a loan, section 16(b) was not violated. No shares changed hands, and there was no "purchase" or "sale" to trigger section 16(b). Viewing the PVFC as a derivative, however, the potential for abuse becomes clear: the insider offered the PVFC "call option" as consideration for the "put option," knowing that the call option would never be exercised. In other words, he used his informational advantage to sell something he knew to be worthless.

Precisely to prevent what would happen in our hypothetical, we have held that "for purposes of Section 16(b), the expiration of a call option within six months of its writing is to be deemed a 'purchase' by the option writer to be matched against the 'sale' deemed to occur when that option was written." Roth v. Goldman Sachs Grp., Inc., 740 F.3d 865, 872 (2d Cir. 2014); see also 17 C.F.R. § 240.16b-6(d). This rule prevents an insider from profiting by selling call options with expiration dates within six months, while knowing, by virtue of his inside information, that the stock price would not rise above the strike price and the option would never be exercised. We think this rule should apply here as well. We therefore hold that a PVFC is akin to the "sale" of a call option (and purchase of a put) by the insider, and this sale should be matched to a "purchase" at the settlement date, should the call option expire. Thus for purposes of section 16 liability, the

11

Sperlings "sold" call options to the banks on the day they signed the contract, and any matching "purchases" would occur – if at all – on the settlement date if these options went unexercised.

Viewing the instant transactions in this manner, it becomes clear why the Sperlings did not violate section 16(b). First, for the transactions that settled above the ceiling, nothing of significance occurred on the settlement date. The bank merely exercised its call options, which is neither a purchase nor a sale under section 16(b). The exercise of a traditional derivative security (as opposed to its expiration) is a "non-event" for section 16(b) purposes. Magma Power Co. v. Dow Chem. Co., 136 F.3d 316, 322 (2d Cir. 1998). Second, even if the banks' call options had expired - as they did in several cases – the expiration of an option can only be matched to its own writing for section 16 purposes, not to another unrelated sale of stock. Allaire Corp. v. Okumus, 433 F.3d 248, 254 (2d Cir. 2006). Since the Sperlings' subsequent stock purchases were not part of the PFVC derivative transaction, the two could never have been matched.

**B. PVFCs are not "hybrid deriviatives"**

Although Chechele would agree with our conclusion that the PVFCs at issue here are a species of derivative, she attempts to analyze these contracts under our emerging "hybrid derivatives" case law governing options without a fixed exercise price. This is the incorrect mode of analysis.

In Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 49-50 (2d Cir. 2012), we held that a hybrid derivative — a derivative without a fixed exercise price — is not "purchased" until the price becomes fixed because only then is "the extent of the profit opportunity defined[.]"[9] Our hybrid derivative cases, however, have all dealt with contracts where one of the parties controlled the timing, and thus the price, at which the option would be exercised. See Analytical Surveys, 684 F.3d at 41; At Home Corp. v. Cox Commc'ns Inc., 446 F.3d 403, 405 (2d Cir. 2006); Magma Power, 136 F.3d at 319. This is critical.

Because one of the parties controls the timing of the exercise, hybrids present two opportunities to use inside information, once at the writing of the contract and again at their exercise. In Analytical Surveys, we emphasized that the "insider's additional opportunity to rely on inside information to time the date of exercise" presented an additional danger. 684 F.3d at 50. This is why we held that the "purchase" for section 16(b) purposes occurs when the price is fixed. The time the price is fixed is when the last opportunity to use inside information occurs, and when the six-month clock for a matching sale should start. See id. at 49-50.

The PVFCs at issue here, however, do not present the same risk of manipulation at the time of their settlement that hybrids do at

---

[9] This is in keeping with SEC regulations, which exclude from the definition of a traditional derivative "[r]ights with an exercise or conversion privilege at a price that is not fixed[.]" 17 C.F.R. § 240.16a-1(c)(6).

the time of their exercise. It is true that with these PVFCs, as with the securities in our hybrid cases, the number of shares that may be called and the price of those shares is not known at the time the contract is written. Nonetheless, with these PVFCs the price was set by a predetermined formula. There is thus no opportunity for additional manipulation after the contract is signed.[10] Because the parties are bound to the formula and dates from the time of contracting, the prices of these PVFC options were <u>fixed</u> at the time they entered the contract even if they are not <u>known</u>.

Viewing these PVFCs as traditional rather than hybrid derivatives also comports with SEC regulations. A related SEC rule provides:

> [I]f [an insider's] increase or decrease [in a derivative position] occurs as a result of the fixing of the exercise price of a right initially issued without a fixed price, where the date the price is fixed is not known in advance and is outside the control of the recipient, the increase or decrease shall be exempt from section 16(b)[.]

17 C.F.R. § 240.16b-6(a). The purpose of this regulation is to avoid "the unfairness of subjecting insiders to liability under

---

[10] As one district court put it, insiders writing PVFCs are

> powerless to manipulate the settlement [to their] advantage. [They are] obligated to settle [on the contractual date], regardless of whether the stock price [is] favorable . . . . While the ultimate number of shares to be transferred [is] not [known], that number [is] dictated by financial formulae and criteria set forth in the [PVFC] and, . . . [can]not be modified[.]

<u>Donoghue</u>, 2006 WL 775122, at *5 (internal quotation marks omitted).

14

Section 16(b) who engage in a purchase or sale and then have an offsetting sale or purchase thrust upon them thereafter by events 'not known in advance' and 'outside the[ir] control.'" Magma Power, 136 F.3d at 322.

Still, because there is some risk of manipulation, as we discussed above, PVFCs do not — and should not — get the benefit of a total section 16(b) exemption. Nonetheless, treating PVFCs as hybrid derivatives could produce the same "unfairness" that prompted the issuance of 17 C.F.R. § 240.16b-6(a). If the "purchase" or "sale" of the derivative does not occur until the price is "fixed" in the sense of being determined, every PVFC could subject the insider to section 16(b) liability. This is because under a hybrid derivative analysis a "sale" will always occur shortly before settlement, when the value to be delivered is determined. Because, under Roth, an expiration of the bank's call option is a "purchase" (by the insider) to be matched with this "sale," section 16 liability would result whenever a PVFC settles below the floor and the bank's call option expires. This does not make sense.

Viewing the PVFCs as traditional derivatives, however, avoids this odd result. The transactions to be matched are not the "fixing" of the price shortly before settlement and the settlement itself, but the writing of the contract and the settlement. As long

as the settlement date is set at least six months out from the contract date, there is no risk of any short-swing profit.

***

    In short, the Sperlings did not violate section 16(b). First, nothing of significance occurred on the Settlement Dates. The banks simply exercised their call options, which is neither a purchase nor a sale under section 16(b). The exercise of a traditional derivative security is a "non-event" for section 16(b) purposes. Magma Power, 136 F.3d at 322. Therefore the Sperlings' subsequent sale of stock after settlement did not trigger liability. Second, even if the banks' call options had expired, under SEC Rule 16b–6(a) "the expiration of an option, when matched against any transaction other than its own writing, is not [a transaction]." Allaire Corp., 433 F.3d at 254. Furthermore, as mentioned earlier, the expiration of the banks' call options is "deemed a 'purchase' by the option writer to be matched against the 'sale' deemed to occur when that option was written." Roth, 740 F.3d at 872. And third, the PVFC transaction was a sale of stock; both the rights the Sperlings granted and received are "put equivalent positions" deemed to be "sale[s] of the underlying securities for purposes of section 16(b)[.]" 17 C.F.R. § 240.16b-6(a). To trigger section 16(b) liability there must be both a purchase and a sale, not two sales. See Roth, 740 F.3d at 870.

To sum up, the PVFCs in this case are properly analyzed under traditional, and not hybrid, derivatives analysis. When that is done, it becomes evident that no "purchase" occurred against which a "sale" could be matched for section 16(b) purposes.

## CONCLUSION

For the foregoing reasons, the district court's judgment is AFFIRMED.



17

