16-1255-cv, 16-1259-cv, 16-1261-cv
Olagues v. Icahn, et al.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2016

(Argued: December 14, 2016     Decided: August 3, 2017)

Docket Nos. 16-1255-cv, 16-1259-cv, 16-1261-cv

————————————————

JOHN OLAGUES,

*Plaintiff-Appellant*,

v.

CARL C. ICAHN, HIGH RIVER LIMITED PARTNERSHIP, ICAHN PARTNERS
LP, ICAHN PARTNERS MASTER FUND LP, ICAHN PARTNERS MASTER
FUND II LP, ICAHN PARTNERS MASTER FUND III LP,

*Defendants-Appellees*.*

————————————————

Before:

CALABRESI, CABRANES, and LOHIER, *Circuit Judges*.

John Olagues appeals from a judgment of the United States District Court
for the Southern District of New York (Gregory H. Woods, J.) dismissing his
actions on behalf of three public companies. Olagues seeks disgorgement of
"short-swing" profits under Section 16(b) of the Securities Exchange Act of 1934
from investment entities controlled by Carl C. Icahn. In contracts with various
third parties, Icahn sold put options and collected cash premiums as
consideration. Because the put options were cancelled unexercised within six

* The Clerk of Court is directed to amend the captions in Docket Nos. 16-1255,
16-1259, and 16-1261 as set forth above.

months, Section 16(b)'s implementing regulations required Icahn to disgorge the amount of the premiums. Olagues contends that Icahn also should have disgorged the "value" from alleged discounts that Icahn received on purchases of related call options. We **AFFIRM**.

JACK G. FRUCHTER (Mitchell M.Z. Twersky, Cassandra Porsch, *on the brief*), Abraham Fruchter & Twersky, LLP, New York, NY, *for Plaintiff-Appellant*.

HERBERT BEIGEL (Robert R. Viducich, Law Office of Robert R. Viducich, New York, NY, *on the brief*), Law Offices of Herbert Beigel, Tucson, AZ, *for Defendants-Appellees*.

LOHIER, *Circuit Judge*:

John Olagues, a shareholder in three public companies—Herbalife, Ltd., Hologic Inc., and Nuance Communications, Inc. (together, the "Companies")—seeks disgorgement of "short-swing" profits under Section 16(b) of the Securities Exchange Act of 1934 from investment entities controlled by Carl C. Icahn (together, "Icahn" or the "Icahn Entities"). In contracts with various third parties, Icahn sold put options based on the stock price of the Companies and collected cash premiums as consideration. Because the put options were cancelled unexercised within six months of their sale, Section 16(b)'s implementing regulations required Icahn to disgorge the amount of the premiums to the Companies, which he did. In addition to the cash consideration

already disgorged, Olagues contends that Icahn also should have disgorged the "value" of alleged discounts that Icahn received on purchases of related call options. The United States District Court for the Southern District of New York (Woods, J.) dismissed Olagues's actions on behalf of the Companies under Rule 12(b)(6) of the Federal Rules of Civil Procedure. On appeal, we **AFFIRM** the District Court's dismissal because Olagues has not plausibly alleged that Icahn failed to disgorge all of the premiums received for writing (that is, selling) the put options.

## BACKGROUND

Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), aims to prevent corporate insiders, who are presumed to possess material information about the corporation, from earning short-swing profits by buying and selling securities within a six-month period. See Gwozdzinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305, 308 (2d Cir. 1998). "We have explained that liability under Section 16(b) does not attach unless the plaintiff proves that there was (1) a purchase and (2) a sale of securities (3) by an [insider] (4) within a six-month period." Chechele v. Sperling, 758 F.3d 463, 467 (2d Cir. 2014) (quotation marks omitted). The parties do not dispute that the Icahn Entities

3

were, during the relevant time period, statutory insiders subject to Section 16(b) because they owned ten percent or more of the outstanding common stock of the Companies.  See 15 U.S.C. § 78p(a)(1).  Section 16(b) imposes a form of strict liability and requires disgorgement even if the insider does not use or intend to profit from inside information.  See Roth v. Goldman Sachs Grp., Inc., 740 F.3d 865, 869 (2d Cir. 2014).

Olagues's allegations focus on Icahn's writing of put options and purchases of related call options[1] that derived their value from the underlying stock prices of the Companies.  The Securities and Exchange Commission (SEC) has promulgated regulations applying Section 16(b) to derivative securities such as put and call options.  See 17 C.F.R. § 240.16b-6.  Rule 16b-6(d) applies where

---

[1] In general terms, a put option is a type of derivative security in which the buyer of the put has the option to sell a fixed number of securities to the writer/seller of the put at a fixed price for a period of time.  A call option gives the buyer the right to buy securities from the writer/seller of the option.  In both cases, the option seller receives a premium from the buyer and anticipates that the option will never be exercised.  Both the seller of a put option and the buyer of a call option generally anticipate that the stock price will increase (a "long" position).  The buyer of a put option and the seller of a call option, by contrast, anticipate the stock price to drop (a "short" position).  By writing put options and purchasing call options, Icahn took a "long" position in the shares of the Companies.  See Chechele, 758 F.3d at 468 nn.6–7; Magma Power Co. v. Dow Chem. Co., 136 F.3d 316, 321 n.2 (2d Cir. 1998).

the insider receives a premium for writing an option that is cancelled or expires unexercised within six months. The rule provides in relevant part:

> Upon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under section 16(b) of the Act. The profit shall not exceed the premium received for writing the option.

17 C.F.R. § 240.16b-6(d). Rule 16b-6(d) "is designed to prevent a scheme whereby an insider with inside information favorable to the issuer writes a put option, and receives a premium for doing so, knowing, by virtue of his inside information, that the option will not be exercised within six months."

Gwozdzinsky, 156 F.3d at 309. "Thus, under Rule 16b-6(d), any insider who writes a put option on securities of the issuer is liable under Section 16(b) to the extent of any premium received for writing the option if the option is either canceled or expires unexercised within six months of its writing . . . ." Id.

Olagues seeks disgorgement of premiums that the Icahn Entities received for writing put options that were cancelled within six months. Each put option gave Icahn's counterparty the option to force Icahn to buy shares in the Companies at a fixed price on a certain date. Olagues alleges that each put

5

option also had a "corresponding" call option. App'x 18.[2] Icahn's counterparty was the same for each "corresponding" option pair: for example, Icahn would sell a put option for $x$ shares in Herbalife to a counterparty and buy a call option for $x$ shares in Herbalife from the same counterparty.[3] Icahn wrote only "European style" put options, which permitted the counterparty to exercise the put option only on a specific expiration date. By contrast, Icahn bought only "American style" call options, which permitted Icahn to exercise the call option at any time through an expiration date.[4] For each option pair, the expiration date of the put option matched the expiration date of the call option, and the options shared the same "exercise price"—that is, the price paid per share upon exercise

---

[2] "App'x" refers to the Joint Appendix filed in Docket No. 16-1255.

[3] Though Olagues filed three separate actions on behalf of each of the three Companies, the transactions and legal issues are identical in every way relevant to this appeal. As did the District Court, we refer only to the Herbalife transactions for the sake of simplicity and by way of example. Our analysis and holding are the same for all three complaints. Our description of the Herbalife transactions that follows is taken from the allegations in Olagues's complaint, which we assume to be true and construe in the light most favorable to Olagues. SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos., 829 F.3d 173, 175 (2d Cir. 2016).

[4] Because Rule 16b-6(d) applies only to an insider's writing of options, we have not been asked to consider Icahn's purchase of call options as a separate source of short-swing profits. We consider the purchase only in combination with Icahn's writing of put options.

of the option. According to the governing option contracts, the exercise of a call option automatically cancelled the corresponding put option. If Icahn exercised call options for 500 shares, for example, the corresponding put options for 500 shares would immediately be cancelled.

Taking the Herbalife transactions as an example, Olagues alleges that over the course of three days in February 2013, Icahn sold put options in 3,230,606 shares of Herbalife common stock, charging a premium of $0.01 per share to the counterparties. The expiration date of the put options was May 10, 2013, and the exercise price was $23.50. On those same three days in February, Icahn paid premiums to the same counterparties for corresponding call options in 3,230,606 shares of Herbalife. The expiration date of the call options was May 10, 2013, the exercise price was $23.50, and the premiums ranged from $12.50 to $14.05 per share. See App'x 17–21.

There is no real dispute that the structure of the options transactions effectively required Icahn to buy all of the shares covered by the options at a fixed price on or before the expiration date. The transactions described in the complaint here committed Icahn to the purchase, on or before May 10, 2013, of 3,230,606 Herbalife shares at a fixed price equal to the average market price of

7

Herbalife stock on the dates the option contracts were executed, which was approximately $36 to $37.[5]

As it turned out, Icahn exercised all of the Herbalife call options on February 28, 2013, and, as the governing contracts contemplated, the put options automatically cancelled on that date. Because the cancellation of the put options occurred only two weeks after their writing, it is undisputed that Icahn had to disgorge the premiums received for writing them. See 17 C.F.R. § 240.16b-6(d).

Icahn disgorged $0.01 per share, the amount formally labeled as the "premium" received for the put options in Icahn's filings with the SEC. But Olagues contends that the Icahn Entities actually received more in premiums than they disgorged—that is, they received additional undeclared consideration for writing the put options in the form of discounts on the premiums they paid to buy the corresponding call options. The Icahn Entities agreed to charge the

---

[5] Because the Icahn Entities had paid $12.50 to $14.05 in premiums, the exercise of the call options (or the put options) at the $23.50 exercise price would result in the Icahn Entities' purchase of Herbalife shares at the market price of approximately $36 to $37 per share. Icahn would exercise the call options if the stock price rose above that market price on or before May 10. But if the stock price remained below that market price on May 10 and Icahn had not yet exercised the call options, the counterparty would exercise the put options on that day to force the purchase. In either event, Icahn was committed to buying all of the shares at roughly $36 to $37 per share on or before May 10.

counterparties lower premiums for the put option contracts, Olagues alleges, in exchange for paying the counterparties lower premiums for the call option contracts, and now, Olagues claims, the "value" of these discounts must be disgorged under Rule 16b-6(d).

To support his claim, Olagues points to what the complaint describes as similar option contracts that were available on the open market when the Icahn transactions occurred. For example, put options in Herbalife, written on February 12–14, 2013 and expiring in mid-May 2013, with exercise prices between $22 and $24, cost anywhere from $0.70 to $1.30 per share as a premium. Likewise, the complaint alleges, a call option purchased on February 12, 2013 and expiring on May 18, 2013, with an exercise price of $24, cost the buyer $13 per share as a premium. App'x 19–21.

Olagues argues that the premiums associated with these open-market option contracts demonstrate that Icahn charged too little for the put options and did not pay enough for the call options, and that the discounts Icahn received on the call option premiums were consideration for writing the put options. See id. at 21–22. The District Court rejected Olagues's comparison to the open-market contracts, concluding that the structure of the corresponding put and call option

9

contracts at issue did not result in short-swing profits beyond what Icahn had disgorged. See Olagues v. Icahn, Nos. 15-cv-898, 15-cv-2476, 15-cv-2478 (GHW), 2016 WL 1178777 (S.D.N.Y. Mar. 23, 2016). In a single judgment entered in March 2016, the District Court dismissed Olagues's complaints pursuant to Rule 12(b)(6). Id. at *15. Olagues timely appealed the dismissal of the three complaints.

## DISCUSSION

We review de novo the District Court's grant of a motion to dismiss under Rule 12(b)(6), accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. Barrows v. Burwell, 777 F.3d 106, 111 (2d Cir. 2015). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Vasquez v. Empress Ambulance Serv., Inc., 835 F.3d 267, 271 (2d Cir. 2016) (quotation marks omitted).

Rule 16b-6(d) requires an insider to disgorge the entire premium actually "received for writing the option[s]" at issue, 17 C.F.R. § 240.16b-6(d), not just the amount reported to the SEC. An insider cannot arbitrarily set aside part of the consideration received for writing an option, artificially label that portion the

10

"premium received" in its SEC filings, and then disgorge only that amount.[6] Cf.

Herrmann ex rel. Walt Disney Prods. v. Steinberg, 812 F.2d 63, 66–67 (2d Cir.

1987) (remanding for recalculation of short-swing profits where agreement's

"discrete treatment" of lump sum payment had the "appearance of artificiality");

Mendell ex rel. Viacom, Inc. v. Gollust, 909 F.2d 724, 728 (2d Cir. 1990)

(describing "broad[]" and "pragmatic" approach to Section 16(b)).  So we agree

with Olagues to the limited extent he demands disgorgement of the total amount

in premiums that Icahn actually received (in other words, "the amount the

purchaser paid [the insider] for the option," Allaire Corp. v. Okumus, 433 F.3d

248, 252 (2d Cir. 2006)).  As we explain below, however, Olagues fails to

plausibly allege that the Icahn Entities disgorged less than the total amount of

premiums they actually received.

     To be sure, as noted, Olagues attempts to describe an unreported

"discount" that the Icahn Entities received when they paid premiums to the

---

[6] Suppose that a counterparty had paid Icahn $0.01 per share plus a $100,000 lump sum payment for writing put options.  All agree that Icahn would have to disgorge both the $0.01 per share and the $100,000 under Rule 16b-6(d), even if the option contract did not describe the lump sum payment as a "premium."  Moreover, disgorgement would be required whether or not the additional consideration was in cash.  See Newmark v. RKO Gen., Inc., 425 F.2d 348, 355 (2d Cir. 1970) ("Whether, upon divestment, the insider receives cash or property should be immaterial . . . .").

11

counterparties for the call options. He alleges that the Icahn Entities paid less than the "true premium value" of those options. The "true premium value," according to Olagues, was more in line with the higher prices of the open-market option contracts described in the complaint, and so he claims that the Icahn Entities must disgorge the difference between the premiums they paid for the call options and the "true premium value" they should have paid.

But even at the motion to dismiss stage, Olagues has not plausibly alleged that the Icahn Entities received a discount on the premiums paid for these call options because, in our view, the open-market option contracts are not meaningfully comparable to the option contracts bought and sold by the Icahn Entities. At least two reasons compel this view. First, the open-market contracts were all standalone "American style" option contracts: they were exercisable at any time up through the expiration date and could expire unexercised if the buyer so chose; they were not combined with any corresponding options that ensured an exchange of shares by the expiration date; and they could be independently priced and sold to third parties. By contrast, Icahn transacted in paired option contracts with counterparties in which Icahn sold put options exercisable only on the expiration date and bought call options exercisable up to

12

the same expiration date, thereby binding the parties to an exchange of shares at a fixed price on or before the expiration date.[7] Olagues does not allege that structuring the transaction in this way was fraudulent or otherwise illegal. Second, the complaint fails to allege the available volume of these open-market contracts or that option contracts covering 3,230,606 shares of the Companies were available on the open market at the prices alleged.

The complaint otherwise fails to allege facts from which we could infer that the Icahn transactions resulted in short-swing profits beyond the $0.01 per share premium for writing the put options. Rather, even if we read the allegations in a way that favors Olagues, the Icahn Entities paid premiums ranging from $12.50 to $14 per share (minus $0.01) for each corresponding pair of put and call options. Furthermore, although the Icahn Entities acquired millions of shares upon exercise of the call options, the exercise of a fixed-price option is a "'non-event' for 16(b) purposes," Chechele, 758 F.3d at 469 (quoting Magma Power Co. v. Dow Chem. Co., 136 F.3d 316, 322 (2d Cir. 1998)), and there is no

---

[7] Cf. Yosha v. Commissioner, 861 F.2d 494, 495–96 (7th Cir. 1988) (explaining that risk of selling an option is that the option will be exercised); Norman Menachem Feder, Deconstructing Over-the-Counter Derivatives, 2002 Colum. Bus. L. Rev. 677, 699 (2002) (noting both that forward parties differ from fully paid option buyers and sellers and that put and call combinations can create synthetic forward contracts).

13

allegation that the Icahn Entities sold shares at a profit within six months of purchasing the call options.[8]

Finally, the transactions described in the complaint fall outside the scope of the SEC's central concern when it promulgated Rule 16b-6(d), which was to stop an insider from receiving and retaining a premium for an option "knowing, by virtue of his inside information, that the option will not be exercised within six months" and hence that no shares will exchange hands. Gwozdzinsky, 156 F.3d at 309. Guided by our discussions in Gwozdzinsky and Chechele, we conclude that, although the put options Icahn wrote were technically cancelled and therefore technically required disgorgement of the $0.01 per-share premium, no additional profit was made in the sense intended by Rule 16b-6(d) because the underlying shares did in fact change hands. See Chechele, 758 F.3d at 469 (noting that the purpose of Section 16(b) is to prevent an insider's use of "informational advantage" to sell an option "he knew to be worthless" because it "would never be exercised"); see also Roth, 740 F.3d at 872 ("When an insider

---

[8] Under Rule 16b-6(b), the SEC "treats the exercise of a fixed-price option as nothing more than a change from an indirect form of beneficial ownership of the underlying securities to a more direct one; because the insider by then is already bound by the terms of the option, the potential for abuse of inside information is minimal." Magma Power, 136 F.3d at 322.

14

sells a call option, and that same option expires unexercised less than six months later, the writer's opportunity to profit on the underlying stock is realized."). Rather, the put options that Icahn sold were "cancelled" only because the functionally equivalent call options were exercised. Whether the counterparty "put" the underlying shares to Icahn or Icahn "called" the shares from the counterparties, the result remained that Icahn bought the shares and was bound to do so given the "corresponding" structure of the options.

For these reasons, we agree with the District Court that Olagues failed to state a plausible claim for additional disgorgement by the Icahn Entities under Section 16(b) and Rule 16b-6(d). We emphasize the limited nature of our holding. We hold that the complaint does not state a claim for relief because it relies exclusively on comparisons to options traded on the open market that have no meaningful similarities to the options at issue here.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the District Court.